724 F.Supp. 320 (1989)
CONSOLIDATED RAIL CORPORATION; Bayonne Industries, Inc.; IMTT-Bayonne and East Jersey Railroad, Plaintiffs,
v.
The CITY OF BAYONNE, a New Jersey municipal corporation, Defendant.
Civ. A. No. 89-3570.
United States District Court, D. New Jersey.
November 9, 1989.
*321 Francis J. Calise, Clifton, N.J., for plaintiff Consol. Rail Corp.
Robinson, Wayne & La Sala by Thomas D. Ruane, Newark, N.J., and Coleman, Dutrey & Thomson, New Orleans, La., for plaintiffs Bayonne Industries, Inc., IMTT-Bayonne and East Jersey R.R.
Wilson, Elser, Moskowitz, Edelman & Dicker by James C. Orr, Newark, N.J., for defendant The City of Bayonne.

OPINION
BISSELL, District Judge.
This civil action was filed on August 23, 1989 seeking, inter alia, a preliminary injunction and declaratory relief from the actions of defendant, the City of Bayonne. Plaintiffs, Consolidated Rail Corporation ("Conrail"), Bayonne Industries, Inc., International-Matex Tank Terminals-Bayonne ("IMTT-Bayonne"), and East Jersey Railroad ("East Jersey"), operate and utilize a gasoline storage and blending facility in Bayonne. (Compl., ¶¶ 9-11; Br. in Support at 1-2). Bayonne Industries owns the 330 acre tract of land where IMTT operates its marine terminal facility. (Compl., ¶ 9; Br. in support at 2). The facility is located in an industrial section of Bayonne and is bordered on the south side by the Kill Van Kull. (Id.) IMTT's business consists of the receipt, processing, storage and redelivering of petroleum products by marine vessels, tank trucks and rail tank cars. (Id.) The majority of products, including the butane shipments that are the subject of this action, travel in interstate commerce. (Compl., ¶¶ 10, 14).
At issue in this action is the shipment of butane in rail tank cars to the IMTT facility for use in the blending and processing of gasoline. (Id. at ¶ 11). The butane is shipped by rail from Canada and from a variety of states in the United States to Conrail's Oak Island Transportation Switching Yard in Newark, New Jersey. (Id. at ¶¶ 16-18). At the switching yard, the cars are organized and delivered to designated interchange tracks by Conrail and then delivered to IMTT by East Jersey. (Id. at ¶¶ 18-19). The IMTT facility has the capacity to offload seven cars at one time, while any excess cars remain under the control of East Jersey on its tracks. (Id. at ¶ 19).
The transportation and handling of butane rail cars is heavily regulated by federal statutes, including the Federal Railroad Safety Act, 45 U.S.C. § 421 et seq. ("FRSA"), and the Hazardous Materials Transportation Act, 49 U.S.C. § 1801 et seq. ("HMTA"). (Id., ¶¶ 20-24). In addition to federal regulation, the City of Bayonne alleges that it also has the authority to regulate on-site activities pursuant to Public Health Nuisance Code § 20-3.1-3.3. (Id., ¶ 34; Br. in Opp. at 11). On or about December 21, 1988, the city's Fire Prevention Bureau began issuing summonses for violations of this municipal code. (Compl., ¶¶ 34-37, Exh. B). The code proscribes activity "which is or may become detrimental or a menace to the health of the inhabitants of this municipality (Bayonne)." (Id., ¶ 34). The violations are based upon City Planning Board Resolution # SPR-80-071285 dated August 13, 1985 which set the maximum number of butane rail cars permitted on the site at 20. (Id., ¶ 37, Exh. C). Conrail and IMTT received 12 summonses between December 21, 1988 and January 4, 1989. (Id., ¶ 35, Exh. B).

I. Prior Proceedings
On August 23, 1989, plaintiffs filed their complaint against the City of Bayonne seeking among other remedies, a permanent injunction prohibiting defendant from enforcing the municipal code summonses and its attempted regulation of the IMTT-Bayonne operation. (See, e.g., Compl., ¶ 54(b)). Specifically, the municipal code and planning board resolution limits the number of loaded or unloaded butane rail cars permitted on IMTT's facility at any one time. (Compl., ¶ 36). On August 24, *322 1989, plaintiffs appeared before United States District Judge Nicholas Politan seeking an order to show cause with temporary restraints. Plaintiffs presented the verified complaint and affidavits from H.J. Kiley (Assistant Division General Manager for Conrail) and Richard R. Fisette (Plant Manager of IMTT-Bayonne) in support of their application for a temporary restraining order. Judge Politan held a hearing on this motion on August 24, 1989 with counsel for plaintiffs and defendant present. (See Transcript of Proceedings).
At the hearing, plaintiffs requested an order to show cause why a municipal court trial scheduled for September 14, 1989 should not be enjoined, and for temporary restraints enjoining Bayonne from issuing further summonses until the return date of the order to show cause. (Tr. at 5-6). The defendant did not object to an order to show cause, however, it did object to the temporary restraints. (Id. at 6). Counsel for Bayonne pointed out that he didn't expect the city to issue additional summonses and that IMTT had been in compliance with the ordinance for several months. (Id.)
At the hearing, the parties finally agreed that the city could issue additional summonses but would serve them on plaintiffs' counsel rather than directly on plaintiffs. (Id. at 14-15). Judge Politan did restrict the defendant from "interfer[ing] in any manner with the movement or handling of the butane cars on the tracts." (Id. at 15). He instructed the defendant that if additional violations were observed, to issue the summonses but not to harass the operation of plaintiffs. (Id.) Judge Politan established a briefing schedule for the cross-motions for summary judgment and found, based upon the evidence before him, that this case was ripe for summary judgment resolution. (Id. at 11-12). Judge Politan held that plaintiffs had made a "strong showing" that the movements of butane are subject to extensive federal regulation, and as such, preempt local ordinances and regulations. (Id. at 15-16). Accordingly, Judge Politan issued the temporary restraining order on August 24, 1989. (Id.)
On September 29, 1989, defendant, by notice of motion, sought to dissolve the temporary restraining order. This Court heard oral argument and declined to dissolve the order having found no changed circumstances that would make the continuation of the order "inequitable."
Presently before the Court are plaintiffs' motion for summary judgment and defendant's cross-motion for summary judgment.

II. Summary Judgment Motions
Under Federal rule of Civil Procedure 56(c), summary judgment should be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." In deciding a motion for summary judgment, the facts must be viewed in the light most favorable to the nonmoving party and any reasonable doubt as to the existence of a genuine issue of fact is to be resolved against the moving party. Continental Insurance Co. v. Bodie, 682 F.2d 436, 438 (3d Cir.1982). The moving party has the burden of establishing that there exists no genuine issue of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The Supreme Court recently stated that in applying the criteria for granting summary judgment,
the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented. The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff. The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict....
Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247, 106 S.Ct. 2505, 2509, 91 L.Ed.2d 202 (1986).
*323 The Court determines that in this case there are no genuine issues of material fact and the case can be adjudicated by determining which party is entitled to summary judgment as a matter of law.

A. Federal Preemption
To prevail on their motion for summary judgment in this matter, plaintiffs must show as a matter of law, either that federal regulations and statutes either occupy or preempt the entire field and prohibit municipalities from regulating in this area, or that compliance with both federal and state law is impossible. Conversely, for defendant to prevail, it must prove that the field is not entirely preempted and that its regulation is a permissible exercise of its police powers.
When a state's exercise of its police power to promote the health, safety or welfare of its citizens is challenged under the Supremacy Clause, the court must "start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947). In determining whether Bayonne's regulation is federally preempted under the Supremacy Clause, this Court must inquire "whether Congress explicitly or implicitly declared that the states are prohibited from regulating" the subject matter of the regulation. Ray v. Atlantic Richfield Co., 435 U.S. 151, 158, 98 S.Ct. 988, 994, 55 L.Ed.2d 179 (1978). If no federal law deals directly with the number of butane rail cars permitted in any one location, then the inquiry must focus on implied, rather than express, preemption. The Supreme Court in Ray explained that "`where failure of ... federal officials affirmatively to exercise their full authority takes on the character of a ruling that no such regulation is appropriate or approved pursuant to the policy of the statute,' States are not permitted to use their police power to enact such a regulation." Ray, 435 U.S. at 178, 98 S.Ct. at 1004-05 (quoting Bethlehem Steel Co. v. New York State Labor Relations Board, 330 U.S. 767, 774, 67 S.Ct. 1026, 1030, 91 L.Ed. 1234 (1947)).
The Court stated in Rice that
[The congressional] purpose may be evidenced in several ways. The scheme of federal regulation may be so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it. Or the Act of Congress may touch a field in which the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject. Likewise, the object sought to be obtained by the federal law and the character of obligations imposed by it may reveal the same purpose.
331 U.S. at 230, 67 S.Ct. at 1152 (citations omitted). See also Silkwood v. Kerr-McGee Corp., 464 U.S. 238, 248, 104 S.Ct. 615, 621, 78 L.Ed.2d 443 (1984). Further, "even if Congress has not completely foreclosed state legislation in a particular area, a state statute is void to the extent that it actually conflicts with a valid federal statute." Ray, 435 U.S. at 158, 98 S.Ct. at 994. Accord Florida Lime & Avocado Growers, Inc. v. Paul, 373 U.S. 132, 142-43, 83 S.Ct. 1210, 1217-18, 10 L.Ed.2d 248 (1963).
This is not the first time this Court has had to decide whether a state or local regulation is preempted by a federal statute or regulatory scheme. In fact, both this Court, and ultimately the Third Circuit, have recently considered cases involving the Hazardous Materials Transportation Act ("HMTA"). Jersey Central Power & Light Co. v. Lacey Township, 772 F.2d 1103 (3d Cir.1985), cert. denied, 475 U.S. 1013, 106 S.Ct. 1190, 89 L.Ed.2d 305 (1986) (township ordinance preempted by HMTA and the Atomic Energy Act of 1954). Related actions which were declared moot on appeal were Jersey Central Power & Light Co. v. State of New Jersey, 772 F.2d 35 (3d Cir.1985) and New Jersey Turnpike Authority v. Jersey Central Power, 772 F.2d 25 (3d Cir.1985). Furthermore, both the intent and the extent of federal regulation in a particular field were examined at length by this Court and the Third Circuit *324 in a case involving municipal regulation of "floating homes" on navigable waters. See Bass River Associates v. Mayor, Township Com'r, et al., 743 F.2d 159 (3d Cir.1984) (local ordinance upheld because federal regulations neither preempted the field nor conflicted with local measures).
In the case at bar, this Court must again examine the relevant statutes and the legislative history to decide whether the field is federally preempted or if the municipal regulation conflicts with federal regulation of the subject matter.

1. Federal Railroad Safety Act ("FRSA")

The FRSA was enacted in 1970 as Pub.L. No. 91-458 titled the Federal Railroad Safety and Hazardous Materials Transportation Control Act of 1970. (Oct. 16, 1970, 84 Stat. 971). In relevant part, the FRSA states:
The Congress declares that the purpose of this chapter is to promote safety in all areas of railroad operations and to reduce railroad-related accidents, and to reduce deaths and injuries to persons and to reduce damage to property caused by accidents involving any carrier of hazardous materials.
45 U.S.C. § 421. Butane is classified as a "hazardous material" pursuant to the HMTA, 49 C.F.R. § 172.101. The FRSA contains an express preemption provision in 45 U.S.C. § 434, which states:
The Congress declares that laws, rules, regulations, orders, and standards relating to railroad safety shall be nationally uniform to the extent practicable. A State may adopt or continue in force any law, rule, regulation, order, or standard relating to railroad safety until such time as the Secretary has adopted a rule, regulation, order, or standard covering the subject matter of such State requirement. A State may adopt or continue in force an additional or more stringent law, rule, regulation, order, or standard relating to railroad safety when necessary to eliminate or reduce an essentially local safety hazard, and when not incompatible with any Federal law, rule, regulation, order, or standard, and when not creating an undue burden on interstate commerce.
See, Missouri Pacific R.R. v. Railroad Com'n of Texas, 850 F.2d 264, 266 (5th Cir.1988), cert. denied, ___ U.S. ___, 109 S.Ct. 794, 102 L.Ed.2d 785 (1989) (§ 434 is an express preemption provision); National Association of Regulatory Utility Com'rs v. Coleman, 542 F.2d 11, 13 (3d Cir.1976) (§ 434 expresses the Act's intent to preempt the field). By its terms and the legislative history, § 434 mandates national railroad safety standards "to the extent practicable." See, e.g., H.R.Rep. No. 1194, 91st Cong., 2d Sess., reprinted in 1970 U.S.Code Cong. & Admin. News 4104, 4108 ("existing state requirements [would] remain in effect until preempted by federal action").
The legislative history of the FRSA reveals Congress' concern for national rail safety standards and accident prevention measures. (Id. at 4104-4108). State participation in this scheme was specifically considered and analyzed. (Id. at 4108-4109). The House Report states:
The most effective role for the State regulatory commissions in the rail safety field has been most difficult to determine in the development of this legislation. At the present time where the Federal Government has authority, with respect to rail safety, it preempts the field. With respect to the reported bill, the task force recommended that existing State requirements remain in effect until preempted by Federal action.
* * * * * *
The committee does not believe that safety in the Nation's railroads would be advanced sufficiently by subjecting the national rail system to a variety of enforcement in 50 different judicial and administrative systems. Accordingly, while it has preserved the framework of certification, it has modified the concept insofar as it applies to the Nation's rail system to make all enforcement Federal in nature. The Secretary will have exclusive authority to assess and compromise penalties and to recommend court action for recovery of such penalties. In addition, *325 for 180 days after a violation has occurred, he will have exclusive authority to seek injunctive relief. Thereafter, participating States will have authority to seek injunctive relief. They will have no authority to assess and compromise penalties or to seek State judicial action. In addition, if the Secretary finds, in writing, that no violation occurred, States cannot act. It should be noted here that the vital element in certification whereby a State has the clear right to participate in the administration of the act is retained.
(Id.)
The legislative history also highlights the truly interstate nature of railroad activities. There had been a proposal to model the FRSA after the Natural Gas Pipeline Safety Act of 1968. (Id. at 4109-4110). In contrast to acceptable state enforcement of specific gas pipeline regulations, the Report notes that:
This committee is of the opinion that the provision that States be permitted to enforce Federal standards does not lend itself to the regulation of the railroad industry; except to the limited degree permitted under section 207.
As noted earlier, under the Natural Gas Pipeline Safety Act of 1968, a distinction was made between interstate transmission facilities and local gathering or distribution lines. While Federal standards are established for both types of facilities, States are permitted to adopt as State standards the Federal standards pertaining to local lines and to enforce them in their own right. This provision for State certification and enforcement of standards with respect to local gathering and distribution lines recognized the capabilities of the States to handle the special aspects of local pipeline safety which are particularly applicable to that community. Federal preemption was retained with respect to interstate transmission facilities because it was recognized that the interstate character of the movement required a single uniform treatment.
The characteristics of the distribution of gas through pipelines, however, is quite different from that of the transportation of goods and materials by railroads.
* * * * * *
With the exception of industrial or plant railroads, the railroad industry has very few local characteristics. Rather, in terms of its operations, it has a truly interstate character calling for a uniform body of regulation and enforcement. It is a national system. Unlike the gas pipelines, the vast bulk of railroad mileage, and operations thereover, are by companies whose operations extend over many State lines.
* * * * * *
To subject a carrier to enforcement before a number of different State administrative and judicial systems in several areas of operation could well result in an undue burden on interstate commerce.
Consequently, it is the judgment of the committee that the nature of railroad operations requires a different system of regulation and enforcement from that which was effected for natural gas pipeline safety.
(Id. at 4110-4111).
The drafters of the Act realized, however, that some state participation was necessary. In concluding that states could regulate in certain limited areas, the Report stated that:
The State may, however, adopt or continue in force an additional or more stringent requirement when necessary to eliminate or reduce an essentially local safety hazard, provided it is not incompatible with Federal requirements and does not create an undue burden on interstate commerce.
The purpose of this latter provision is to enable the States to respond to local situations not capable of being adequately encompassed within uniform national standards. The States will retain authority to regulate individual local problems where necessary to eliminate or reduce essentially local railroad safety hazards. Since these local hazards would not be Statewide in character, there is no intent *326 to permit a State to establish Statewide standards superimposed on national standards covering the same subject matter.
(Id. at 4117).
Federal regulations concerning rail transportation of hazardous materials are codified in the Code of Federal Regulations. This area is subject to extensive federal regulations and "state" participation is strictly limited. For example, the general operating, handling, loading and unloading of rail tank cars is specifically regulated in great detail under 49 C.F.R. § 174 et seq. (1988). This section includes a provision entitled "Movements to be expedited," which provides that:
(a) A carrier must forward each shipment of hazardous materials promptly and within 48 hours (Saturday, Sundays, and holidays excluded), after acceptance at the originating point or receipt at any yard, transfer station, or interchange point, except that where biweekly or weekly service only is performed, a shipment of hazardous materials must be forwarded on the first available train.
(b) A tank car loaded with any flammable liquid or gas, or a poison gas, may not be received and held at any point, subject to forwarding orders, so as to defeat the purpose of this section or of § 174.204 of this subchapter.
49 C.F.R. § 174.14. Section 174.204 provides specifications for the tank car delivery of liquified gas and gas. 49 C.F.R. § 170 et seq. mandates very detailed specifications for tank cars, including the type of materials to be used, valve design, venting and safety release valves. Similarly, 49 C.F.R. § 213 et seq. lists detailed provisions regulating track safety standards.
Also regulated under Title 49 is the extent and manner of state participation in safety regulation. 49 C.F.R. § 212 et seq. provides for limited "state participation in investigative and surveillance activities under the Federal railroad safety laws and regulations." 49 C.F.R. § 212.1. For a state agency to participate in these activities, it must submit appropriate documentation to the federal government to become "certified" to do so. (Id. at §§ 212.5 and 212.107). If a state agency receives certification, it may inspect and monitor a railroad's compliance with federal regulations. (Id. at § 212.101(d)). This section also establishes qualifications for state inspection personnel and prescribes requirements for specific inspector functions. 49 C.F.R. §§ 212.201-227.
It should be noted that the FRSA only allows for "state" regulation of and participation in railroad safety. No provision is made for political subdivisions of the state to participate in this area. See, e.g., Southern Pacific Transportation Co. v. Town of Baldwin, 685 F.Supp. 601, 603 (W.D.La. 1987) (city ordinance regulating train speed is not equivalent to "state" action). Cf. HMTA § 1811.

2. The Transportation Safety Act ("TSA") and the Hazardous Materials Transportation Act ("HMTA")

In 1974, Congress passed the Transportation Safety Act which amended the Federal Railroad Safety Act and the Hazardous Materials Transportation Act of 1976. See Pub.L. No. 93-633. One of the purposes of the amendment was "to broaden federal regulatory control over interstate and foreign shipments of hazardous materials by rail and other transportation modes." H.R.Rep. No. 1083, 93d Cong., 2d Sess. 4, reprinted in 1974 Code Cong. & Admin. News 7669. Sections 4 and 5 of the TSA amended the HMTA (formerly 49 U.S.C. § 1762, now 49 U.S.C. §§ 1801 et seq.) to expand and consolidate federal control over the transportation of hazardous materials. (Id. 7679). The amendment had three basic purposes:
First, the present authority to regulate the shippers and carriers of hazardous materials is expanded to cover manufacturers of the containers and packages in which such substances are transported. Second, civil penalties and injunctive relief are added to the criminal penalties to which violators of hazardous materials regulations are subject under present law. Third, certain specific statutory delegations of authority to entities (the Federal Aviation Administration, the Federal Railroad Administration, and the *327 Federal Highway Administration) within DOT are eliminated and such authority is consolidated in the Secretary of Transportation.
(Id. at 7679-7680).[1] In particular, this section gives the Secretary of Transportation the broad powers to regulate specific activities including; "packing, handling, labeling, marking, placarding, and routing of materials." (Id. at 7680). See also 49 U.S. C. §§ 1803-1805. In fact, the final wording of the Act deleted a provision allowing "citizen's safety petitions" and petitions by "any interested party" (including governmental entities), thereby vesting enforcement powers solely with the Secretary. (Id. at 7690, 7693).
Title 49 U.S.C. § 1805(a) provides the criteria for the handling of hazardous materials. It provides that
The Secretary is authorized to establish criteria for handling hazardous materials. Such criteria may include, but need not be limited to, a minimum number of personnel; a minimum level of training and qualification for such personnel; type and frequency of inspection; equipment to be used for detection, warning, and control of risks posed by such materials; specification regarding the use of equipment and facilities used in the handling and transportation of such materials; and a system of monitoring safety assurance procedures for the transportation of such materials. The Secretary may revise such criteria as required.
As for the Act's relationship to other laws or regulations effecting hazardous materials, § 1811 states:
(a) General. Except as provided in subsection (b) of this section, any requirement, of a State or political subdivision thereof, which is inconsistent with any requirement set forth in this title, or in a regulation issued under this title, is preempted.
(b) State Laws. Any requirement, of a State or political subdivision thereof, which is not consistent with any requirement set forth in this title, or in a regulation issued under this title, is not preempted if, upon the application of an appropriate State agency, the Secretary determines, in accordance with procedures to be prescribed by regulation, that such requirement (1) affords an equal or greater level of protection to the public than is afforded by the requirements of this title or of regulations issued under this title and (2) does not unreasonably burden commerce. Such requirement shall not be preempted to the extent specified in such determination by the Secretary for so long as such State or political subdivision thereof continues to administer and enforce effectively such requirement.
Congress included this provision "to preclude a multiplicity of State and local regulations and the potential for varying as well as conflicting regulations in the area of hazardous materials transportation." S.Rep. No. 1192, 93d Cong., 2d Sess. 37 (1974).
The Third Circuit has explained that "[a] state or local law is `inconsistent' with federal requirements under the HMTA when it is not possible to comply with both, or where state requirements are an obstacle to an execution of federal law." Jersey Central Power & Light Co. v. Lacey Township, 772 F.2d at 1113 (citing 49 C.F.R. § 107.209(c)(1), (2)). The Court notes that although plaintiffs are correct in their assertion that the FRSA only provides for "state" participation and regulation, not for municipalities (see, e.g., Br. in Support at 7, 23 and p. 10 infra.), at least for the transportation of hazardous materials by rail, the federal scheme recognizes the possibility of local involvement. 49 C.F.R. § 107.201 (1988) provides that
(a) This subpart prescribes procedures by which (1) a State or a political subdivision of a State having a requirement pertaining to the transportation of hazardous materials or any person affected by the requirement may obtain an administrative ruling as to whether the requirement *328 is inconsistent with the Act or regulations issued under the Act, and (2) a State or a political subdivision of a State may obtain a determination as to whether a requirement of that State or political subdivision, which is inconsistent with the Act or regulations issued under the Act and therefore preempted by section 112(a) of the Act is not so preempted.
(Emphasis added). A "political subdivision" includes "municipalit[ies], ... public corporation[s], board[s] or commission[s] established under the laws of one or more States." 49 C.F.R. § 107.201(b).[2]
It is within the framework of the FRSA and the HMTA that the Court must decide whether Bayonne's resolution is preempted by federal regulation. The opposed regulation is a "resolution" of the Bayonne Planning Board which is enforced through a municipal ordinance. (See Defendant's Br. at 12; Compl., ¶¶ 34-37, Exh. B). The defendant asserts that the "sole purpose" for this resolution is to "protect the safety of Bayonne residents" from a local safety hazard. (Id.) That hazard is the potential for a fire caused by the handling of butane in a facility comprised of hundreds-of-thousands of gallons of flammable fuels within a close proximity of a densely populated residential area. (Id.; Sheren Aff.). As such, defendant argues that its enforcement of a 20 rail car limitation is: (1) necessary to reduce a local safety hazard; (2) is not incompatible with federal regulations; and (3) does not unnecessarily burden interstate commerce. (Id. at 11-15) (citing Missouri Pac. R.R. Co. v. R.R. Comm'n Texas, 671 F.Supp. 466, 470 (W.D. Texas 1987).
A survey of recent cases reveals the fact-sensitive nature of whether a state or local regulation is preempted by the FRSA or the HMTA. For example, a state regulation requiring a caboose or other safety device on trains travelling through Texas was held to be preempted under the FRSA. Missouri Pacific R.R. v. Railroad Com'n of Texas, 850 F.2d 264 (5th Cir.1988), cert. denied, ___ U.S. ___, 109 S.Ct. 794, 102 L.Ed.2d 785 (1989). When states or towns attempt to regulate train speed, the courts have uniformly held those regulations preempted by the FRSA because of specific regulations issued by the Secretary of Transportation. See, e.g., City of Covington, Ky. v. Chesapeake & Ohio Railway Co., 708 F.Supp. 806 (E.D.Ky.1989); Southern Pacific Transportation Co. v. Town of Baldwin, 685 F.Supp. 601 (W.D.La.1987); Consolidated Rail Corp. v. Smith, 664 F.Supp. 1228 (N.D.Ind.1987). A state's actions under its Occupational Safety and Health Act, banning creosote-coated railroad ties out of concern for the health and safety of its residents was held to be preempted by the FRSA. CSXT, Inc. v. Michigan Dept. of Labor, 703 F.Supp. 44 (W.D.Mich.1988). State regulations that have not been found preempted include: regulations concerning track clearance and walkway standards, Southern Pacific Transportation Co. v. Public Utilities Com'n of the State of California, 820 F.2d 1111 (9th Cir.1987) (not preempted by FRSA); a state licensing fee for transportation of hazardous materials by truck, New Hampshire Motor Transport v. Flynn, 751 F.2d 43 (1st Cir.1984) (not preempted by HMTA); and a city's ordinance regulating truck routes of hazardous materials through its city limits, National Tank Truck Carriers, Inc. v. City of New York, 677 F.2d 270 (2d Cir.1982) (not preempted by HMTA, local safety concerns of densely populated city did not conflict with federal regulations). But cf., City of New York v. United States Dept. of Transportation, 715 F.2d 732 (2d Cir.1983), appeal dismissed and cert. denied, 465 U.S. *329 1055, 104 S.Ct. 1403, 79 L.Ed.2d 730 (1984) (DOT ruling under HMTA concerning transportation of radioactive materials by highway held valid despite argument by city that a catastrophic accident could occur once every 300 million years due to this regulation). See also Jersey Central Power & Light Co. v. Lacey Twp., 772 F.2d 1103 (3d Cir.1985), cert. denied, 475 U.S. 1013, 106 S.Ct. 1190, 89 L.Ed.2d 305 (1986) (specific regulations promulgated under the HMTA preempt the town's ordinance regulating routes for hazardous materials).
These cases were all decided on the extent of federal regulation of the particular subject matter in question. In the matter sub judice, the defendant is attempting to regulate aspects of the handling, off-loading and storage of butane rail cars by limiting the maximum number of cars allowed on site. The FRSA and HMTA provide extensive regulations in the area of transportation, loading, unloading, handling and storage of a hazardous material such as butane. As previously cited, 49 C.F.R. § 174 et seq. provides detailed regulations for the carriage by rail of hazardous materials. Subpart "F," entitled "Detailed Requirement for Gases," § 174.200 et seq., provides "special handling requirements" for certain materials, including butane. For example, this section states that
(1) A tank car containing compressed gas may not be unloaded unless it is consigned for delivery and unloaded on a private track (see § 171.8 of this subchapter). However, if a private track is not available, it may be delivered and unloaded on carrier tracks subject to the following conditions ...
* * * * * *
(2) The following tank cars may not be delivered and unloaded on carrier tracks unless the lading is piped directly from the car to permanent storage tanks of sufficient capacity to receive the entire contents of the car; however, such cars may be stored on a private track (see § 171.8 of this subchapter) or on carrier tracks designated by the carrier for such storage:
(ii) A tank car, ... containing ... liquefied; or liquefied petroleum gas; and having interior pipes for liquid and gas discharge valves equipped with check valves.
49 C.F.R. § 174.201. See also 49 C.F.R. § 174.67 (specific provisions for tank car unloading procedures).
Of special interest is 49 C.F.R. § 173 et seq. which specifies "general requirements for shipments and packagings" of hazardous materials. This section includes detailed subparts concerning the preparation of hazardous materials for transportation and handling. Specifically, 49 C.F.R. § 173.314(f) entitled "Special requirements for liquefied petroleum gas and butadiene tank cars," provides the maximum filling densities for rail cars. Note 1 to this section states that "[W]hen these filling densities are used, tank cars must be shipped directly to consumers for unloading. Storage in transit is not permitted." Although this note is not explained or expanded upon in the regulations, a plain reading of the language indicates the intent is that butane must be shipped directly to the consumer and not held in storage. This would militate against Bayonne's resolution, which necessarily requires storage of excess butane rail cars at other facilities while awaiting unloading at the consumer's facility, IMTT-Bayonne.
This specific provision has been cited and discussed in an "Inconsistency Ruling" by the Department of Transportation ("DOT"). The DOT issues Inconsistency Rulings when a state applies for such a ruling under procedures set forth in 49 C.F.R. § 107.201-107.209. Section 107.201 et seq., as cited in footnote 1 infra., prescribes procedures for "a State or political subdivision of a State having a requirement pertaining to the transportation of hazardous materials ... [to] obtain an administrative ruling as to whether the requirement is inconsistent with the Act ... and therefore preempted." In 1987, the Office of Hazardous Materials Transportation ("OHMT") was asked to determine whether Nevada's Administrative Code was inconsistent with the HMTA. Inconsistency Ruling IR-19, 52 Fed.Reg. 24404 (1987), *330 aff'd, 53 Fed.Reg. 11600 (1988). The Nevada Administrative Code required a permit to transport radioactive materials destined for disposal in Nevada. The Code regulated the loading, unloading and storage of radioactive materials from railroad equipment. (Id. at 24405). In finding Nevada's regulation inconsistent with the HMTA, the OHMT cited to 49 C.F.R. §§ 174.14(a) and 174.314(f). Section 174.14(a) is the 48-hour provision which prescribes that a rail carrier must transport hazardous materials within 48 hours "after acceptance at the originating point or receipt at any yard." The OHMT found that Nevada's regulation had a strong potential for delaying hazardous material shipments which was inconsistent with § 174.14(a). (Id. at 24411). In discussing § 174.314(f), the OHMT noted that
Requirements for compressed gases in tank cars ... provide that, when that density is used, tank cars must be loaded and shipped directly to consumers for unloading and that storage in transit is prohibited. § 173.314(c), note 15. A similar prohibition applies to tank cars carrying liquefied petroleum gas and butadiene [materials not covered by the PSC regulations]. § 173.314(f), note 1.
In summary, the HMR contain a comprehensive series of regulations relating to the storage of hazardous materials incidental to transportation by rail. These regulations authorize or prohibit specific types of hazardous materials storage under specified circumstances. Creation by the PSC [Nevada's Public Service Commission] of a separate regulatory regime for rail transport-related storage of hazardous materials raises the spectre of widespread confusion. The PSC regulations are so open-ended and discretionary that they authorize the PSC to approve storage prohibited by the HMR or prohibit storage authorized by the HMR.
(Id. at 24410).
While an advisory opinion by the DOT is not binding on this Court, it does give the Court additional insight into the purpose of § 174.314 and note 1. The extent of federal regulation in the area of the transportation, loading, unloading and storage of hazardous materials is comprehensive. While this Court recognizes Bayonne's safety concerns dictated in part by its geography, it cannot ignore the preemptive nature of the federal regulations in this area. The FRSA and HMTA provide a comprehensive scheme of regulation designed to promote the safe handling and storage of hazardous materials. In fact, one of the reasons for the 48-hour rule, and the direct shipment to the consumer provision, is the concern over safety. In the Inconsistency Ruling previously cited, the OHMT noted that the safety risks inherent in transporting hazardous materials recognized in 49 U.S.C. App. § 1801, required that transit time be minimized. 52 Fed.Reg. at 24409 (quoting 49 Fed.Reg. 760, 765 (1983)). The obvious counclusion is that the more frequently hazardous material is handled during transportation, the greater the risk of mishap. Accordingly, these provisions require that the material reach its destination as quickly as possible, with the least amount of handling and temporary storage.
Were the Court to allow Bayonne to enforce a 20-car limit, the effects would be in conflict with federal provisions. Plaintiffs have alleged that they do not control the scheduling and number of rail cars on-site at any one time. (Br. in Support at 3-4, 16-17). In opposition, defendant alleges that "[t]he quantity of butane cars received at the Bayonne facility is directly controlled by IMTT-Bayonne's ordering practice." (Ahern Cert., ¶ 11). It is then argued that the 20-car limitation is reasonable and more than required because the total number of cars received in 1988, divided by the number of work days, only equals 6.25 cars a day. (Id.; Br. in Opp. at 6). The defendant simply asserts in conclusory fashion that the plaintiffs control the number of cars received. No information concerning the basis of that knowledge is provided. (See Reply Br. in Support at 6, n. 3). Whether plaintiffs have some degree of control over the number of cars received, however, is not a material fact central to this Court's decision. If the limitation is enforced, excess rail cars will be *331 temporarily stored elsewhere back up the line from IMTT-Bayonne. This is contrary to the implicit intent of 49 C.F.R. §§ 174.14(a) and 174.314, n. 1. Furthermore, if the present limitations were upheld, could not other municipalities through which the cars travel, or briefly come to rest, enact similar ordinances thereby creating a patchwork quilt of local regulation generating chaos in the movement of butane tank cars along their assigned routes? Finally, although the defendant characterizes the facility as the endpoint in the transportation of butane (presumably to make local regulation more acceptable), a more accurate assessment reveals that it is merely the midpoint of the operation. The IMTT-Bayonne facility blends the butane with gasoline to obtain the required octane levels. From this facility, the blended product is then shipped to customers by rail, motor carrier and vessel, through interstate commerce. Accordingly, Bayonne's Planning Board Resolution and its enforcement through its Public Health Nuisance Code is preempted by federal law.

B. State Preemption
Although given the Court's decision that Bayonne's actions are federally preempted it is not necessary to consider state preemption, the Court finds additional support for its decision under New Jersey regulations.
It is undisputed that New Jersey incorporated the regulatory standards of the HMTA into its state laws concerning the transportation of hazardous materials. N.J.S.A. 39:5B-25 et seq., N.J.A.C. 16:49-1.1 et seq. (See Br. in Support at 36; Br. in Opp. at 22). N.J.S.A. 39:5B-25 defines "hazardous materials" by citing to the Secretary of Transportation's pronouncements in the HMTA, 49 U.S.C.App. § 1801 et seq. Specific references are made to the regulatory provisions in the Code of Federal Regulations and that "rules and regulations concerning the transportation of hazardous materials, which shall, to the maximum extent practicable, conform to the requirements established by 49 C.F.R. Parts 100-199." See N.J.S.A. 39:5B-26. The authority to enforce the provisions of 39:5B-25 et seq. rests solely with the State Police Office of Hazardous Materials Transportation Compliance and Enforcement. N.J.S.A. 39:5B-27. Enforcement and annual recommendations in the form of a report to the governor and the legislature is to be accomplished through state agencies. N.J.S.A. 39:5B-28. There are no provisions allowing for municipal involvement in this regulatory scheme.
Additionally, N.J.S.A. 21:1B-1 et seq. specifically regulates "liquefied petroleum gas" ("LPG"), which includes butane. N.J. S.A. 21:1B-1(a). Chapter 1B, entitled "Liquefied Petroleum Gases," authorizes the regulation of LPG by the State Commissioner of Labor and Industry. N.J.S.A. 21:1B-9 (as amended on July 27, 1972). This regulation of LPG includes facilities such as IMTT-Bayonne. N.J.S.A. 21:1B-2(b). This chapter also contains its own preemption provision which states:
No municipality or other political subdivision shall adopt or enforce any ordinance or regulation in conflict with the provisions of this act or with the regulations promulgated under section two [21:1B-5] of this act.
N.J.S.A. 21:1B-7.
The extent of state regulation over the LPG industry was highlighted by a 1977 decision of the New Jersey Appellate Division in Scheff v. Township of Maple Shade, 149 N.J.Super. 448, 374 A.2d 43 (App.Div.), certif. denied, 75 N.J. 13, 379 A.2d 244 (1977). In that case, plaintiff had been denied a variance by the municipal zoning board to construct a 30,000 gallon LPG tank facility, despite prior state approval. The municipality's expressed reasons for denying the variance were based on local safety concerns that would "potentially create a condition which would threaten the public health and safety and would be detrimental to the proper use of the surrounding area." (Id. at 454, 374 A.2d 43). The trial court found these concerns to be legitimate and affirmed the board's decision. (Id.) In reversing the trial court, the Appellate Division held that the town's decision was in direct conflict with state law and therefore invalid. (Id. at 455, 374 A.2d *332 43). The court noted that N.J.S.A. 21:1B-1 et seq. provided detailed regulations of LPG operations. (Id.) The court found that the town's disapproval of the site plan was "repugnant" to the state's finding based on two legal principles: (1) an ordinance will fall if it contradicts a statute (quoting Summer v. Teaneck, 53 N.J. 548, 554, 251 A.2d 761 (1969)); and (2) in any conflict between the two, the statute will always prevail. (Id., 149 N.J.Super. at 456, 374 A.2d 43). Additionally, the court quoted the "preemption provision" in N.J.S.A. 21:1B-7 for the proposition that this "invested the State with supremacy with respect to the matters concerning LPG committed to the jurisdiction of the Commissioner of Labor and Industry, and municipal action with respect to purely local concerns cannot be permitted to nullify the effect of action taken by the Commissioner pursuant to its terms." (Id. at 456, 374 A.2d 43) (emphasis added).
The court in Scheff also recognized a formal opinion issued by the New Jersey State Attorney General interpreting the effect of N.J.S.A. 21:1B-1 et seq. That opinion stated that the statute
was enacted to establish a uniform scheme of regulation of the liquified petroleum gas industry throughout the state, and thus the promulgation of a regulation thereunder precludes more stringent municipal regulation of the same matter, since an ordinance is deemed to be in conflict with a state law or regulation when it prohibits acts permitted by the state.

(Op.Atty.Gen., July 1, 1953, No. 27) (emphasis added). (Id.) The court concluded by noting that it was irrelevant that the township's action was taken pursuant to its zoning provisions, rather than under its police powers. (Id. at 457, 374 A.2d 43). As for the "local nature" or concerns over the storage of LPG, the court stated that storage is not a matter of purely local concern, as evidenced by the "Legislature's view that statewide regulation of LPG storage and transportation `is necessary for the immediate preservation of the public peace, health and safety.'" (Id.) (quoting N.J. S.A. 21:1B-8).
Defendant argues that its planning board resolution compliments, rather than conflicts with, N.J.S.A. 39:5B-25 et seq. and 21:1B-1 et seq. (Br. in Opp. at 21-22). Bayonne concludes that in fact, its limitation "promulgates" the purpose expressed in N.J.S.A. 21:1B-8 by providing additional safety measures to ensure the "public peace, health and safety." (Id.)
This Court cannot agree with defendant's proposition for several reasons. First, to the extent the state has incorporated the federal regulations promulgated under the HMTA, Bayonne's regulation is preempted as previously discussed. Second, the state has established its own comprehensive regulations for LPG storage, handling and use. (N.J.S.A. 21:1B-1 et seq.) A plain reading of those regulations and the insights provided in the Scheff decision, lead to the conclusion that Bayonne's actions are preempted by state regulations.

C. Police Power
Finally, the Court notes that Bayonne's stated intent of safeguarding its residents through the enforcement of a 20-car maximum is not adequately and validly supported. No basis or rationale is given for the selection of the number 20. The IMTT-Bayonne facility stores millions of gallons of gasoline and blends butane with the gasoline to achieve the necessary octane levels. (Compl., ¶ 11). The obvious potential for a serious accident is not subject to reasonable dispute, and as defendant repeatedly points out, has resulted in a "significant" fire on July 9, 1986. (See, e.g., Sheren Aff., Exh. A; Br. in Opp. at 7, 12). This fire, however, was the result of a leak in a gasoline storage tank that subsequently exploded; it did not involve butane. The Court recognizes, of course, that the mere presence of a substance such as butane increases the potential for fire hazards and may compound the difficulties associated with other, unrelated fire hazards. But, no evidence has been presented by the defendant or its "experts" to suggest that 20 rail cars or less are safer or more manageable than any other number of cars. (See Ahern and Sheren Cert's.).
*333 To be a constitutional exercise of police power, a local zoning ordinance must be substantially related to achieve the desired goal of protecting the public health, safety and welfare. Mark-Garner Associates, Inc. v. Bensalem Tp., 450 U.S. 1029, 101 S.Ct. 1737, 68 L.Ed.2d 223 (1981); Quick-Chek Food Stores v. Springfield Tp., 83 N.J. 438, 448, 416 A.2d 840 (1980). The number 20 apparently was derived more from the process of negotiation between the parties during applications by plaintiffs to expand the facility and for site plan approval (Ahern Cert., ¶¶ 6-11), than from expert opinion regarding such issues as potential hazards, containment and evacuation routes. The defendant should not be permitted to regulate in such a comprehensively legislated field through negotiated site plan and zoning approvals by the Bayonne Planning Board.

CONCLUSION
For all the foregoing reasons, this Court finds that Bayonne's enforcement of a 20-rail car limit is preempted by federal and state regulations and is an improper attempted exercise of its police power. For those reasons, the Court need not address the other issues raised. Accordingly, the Court grants plaintiffs' motion for summary judgment, and denies that of the defendant. The Court is prepared to enter an order granting a permanent injunction against the enforcement of the 20-rail car limit, and taxing costs against defendant, if this is to be the complete and final judgment in the case. Plaintiffs are directed to prepare and submit an order, on notice to defense counsel. Plaintiffs are also directed to advise the Court, when submitting the order, as to whether they intend to pursue any claims for damages or other relief.
NOTES
[1] Cf. Bass River Associates, 743 F.2d at 162-64 (based upon the legislative history, it was obvious that the federal statute did not preempt the local regulation at issue and that the statute's purpose was unrelated to local environmental and health concerns).
[2] While 49 C.F.R. § 107.201(a)(2) provides an opportunity for a state or political subdivision thereof to obtain an advisory opinion from the Secretary of DOT for an exemption from preemption for inconsistent local regulations, it is not necessary to seek this administrative ruling prior to enacting the local regulation. A district court can decide the issue without a prior DOT opinion, although it may at times be advantageous to wait for a more fully developed administrative record. See New Hampshire Motor Transport v. Flynn, 751 F.2d 43, 50-51 (1st Cir. 1984). See also National Tank Truck Carriers v. City of New York, 677 F.2d 270, 275 n. 5 (2d Cir.1982).