**NEW YORK STATE DEPARTMENT OF ENVIRONMENTAL CONSERVATION and Thomas C. Jorling, as Commissioner of the New York State Department of Environmental Conservation, Plaintiffs,**

v.

**UNITED STATES DEPARTMENT OF ENERGY and John S. Herrington, as Secretary of the United States Department of Energy; United States Department of Transportation, United States Coast Guard, James Burnley IV, as Secretary of the United States Department of Transportation, and Admiral Paul A. Yost, as Commandant of the United States Coast Guard; United States Department of the Army and John O.**

**Marsh, Jr., as Secretary of the United States Department of the Army; and United States Department of the Air Force and Edward C. Aldridge, Jr., as Secretary of the United States Department of the Air Force, Defendants.**

Nos. 89–CV–194 to 89–CV–197.

United States District Court,
N.D. New York.

April 26, 1994.

G. Oliver Koppell, Atty. Gen., Albany, NY (Joel F. Spitzer, Asst. Atty. Gen., of counsel), for plaintiffs.

U.S. Dept. of Justice, Environmental Defense Section, Environment and Natural Resources Div., Washington, DC (David M. Thompson, of counsel), for defendants.

## MEMORANDUM–DECISION AND ORDER

### INTRODUCTION

McCURN, Senior District Judge.

In January 1989, the New York State Department of Environmental Conservation ("NYDEC") commenced these four consolidated actions in New York State Supreme Court against the United States Department of Energy ("United States") as representative of ten federal facilities located in New York State which have been underpaying certain regulatory charges assessed against them by NYDEC.[1] On February 17, 1989, the United States filed a notice of removal of these actions to this court. In its original complaint, NYDEC sought a judgment declaring that the United States is required to pay NYDEC certain past due fees totalling approximately $1,000,000 as well as accrued interest on this sum. Additionally, NYDEC sought a declaration that the United States may no longer withhold payment of such charges to NYDEC. In its answer, the United States asserted a counterclaim against NYDEC which sought a refund of approximately $400,000 plus interest for payments made by the United States to NYDEC regarding the regulatory fees charged by NYDEC.

On April 10, 1991, the parties filed cross-motions for summary judgment. In a decision dated August 13, 1991, this court granted in part and denied in part both motions. *See New York State Dep't of Envtl. Conservation v. United States Dep't of Energy*, 772 F.Supp. 91 (N.D.N.Y.1991) ("*NYDEC*") (McCurn, C.J.). On May 6, 1992, the court held a status conference. At that conference, the court gave NYDEC approximately three months to serve new affidavits and gave the United States approximately three months after that to depose the affiants. After some delay, NYDEC served the new affidavits in late January 1993 and depositions were conducted in early May 1993. The court held another status conference on December 29, 1993. At that conference, both parties stated that they believed this matter could be disposed of as a matter of law. Therefore, the court directed the parties, to bring cross-

---

1. The ten federal facilities involved in this action are: two Air Force bases (the Plattsburgh Air Force Base and Griffiss Air Force Base); five Army facilities (Fort Drum, the Military Academy at West Point, the Defense National Stockpile Center in Scotia, the Seneca Army Depot in Romulus and the Watervliet Arsenal); the Coast Guard Support Center on Governor's Island; and two Department of Energy laboratories (the Knolls Atomic Power Laboratory and the Brookhaven National Laboratory in Upton).

motions for summary judgment addressing the remaining issues in this case. The court heard oral argument on these motions on March 29, 1994. The following constitutes the court's findings of fact and conclusions of law with respect to the issues raised.

## BACKGROUND [2]

In order to place the issue presented by these motions in the proper context, it is necessary to review, in some detail, the parties' claims and the court's previous decision in this matter. Pursuant to New York Environmental Conservation Law ("NYECL"), hazardous waste generators and the operators of such facilities, subject to Titles 3, 7, 9 or 11 of NYECL Article 27, are required to pay the fees set forth in NYECL § 72–0402. Likewise, waste transporters, subject to the permit requirements detailed in Title 3 of NYECL, Article 27, are required to pay the annual charges set out in NYECL § 72–0502 (hereinafter these two fees will be referred to collectively as "waste regulatory charges"). Finally, operators of waste water facilities, subject to regulation under Titles 7 or 8 of NYECL, Article 17, are required to pay the annual fees detailed in NYECL § 72–0602 ("water regulatory charges"). All of these regulations became effective on April 1, 1983.

The amount of these regulatory charges varies in relation to the particular size or quantity of the facilities' operations (e.g., gallons, pounds, vehicles) rather than upon the particular services rendered to such facilities by NYDEC. Over the past several years, these fees have increased in amount, and the State has placed the amounts collected from these regulatory charges in various funds.

Beginning in 1985, the rates for waste regulatory charges were statutorily doubled from the 1983 and 1984 levels. In 1983 and 1984, the State deposited all waste regulatory charges received into New York's general revenue fund. From 1985 through 1988, half of the receipts collected by these fees were placed in the State's general revenue fund and the other half were deposited into a special hazardous waste remedial fund—New York's environmental superfund. Since 1989, half of these funds have been deposited in New York's environmental superfund and the other half have been deposited into the State's special enforcement fund.

In 1989, the water regulatory charges were more than doubled from the 1983 through 1988 levels. From 1983 until 1989, the State deposited the moneys received from its water regulatory charges into its general revenue fund. Since that time, however, the State has deposited these assessments into a special environmental enforcement fund.

In support of its original summary judgment motion, the United States argued that the charges sought by NYDEC constituted a constitutionally impermissible tax for which it was not liable pursuant to the doctrine of sovereign immunity. Alternatively, the United States claimed that the charges were unreasonable in light of the services rendered to the federal facilities. NYDEC countered with the assertion that the Clean Water Act ("CWA"), 33 U.S.C. § 1323, and the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6961, constituted blanket waivers of the United States' sovereign immunity with respect to these regulatory fees because such fees constituted requirements with which the United States must comply pursuant to these statutes.[3]

---

2. The facts that underlie this action are not in dispute. For the following recitation of these facts, the court relies upon the parties' submissions as well as its previous decision in this matter.

3. The CWA provides, in pertinent part, that

(a) Each department, agency, and instrumentality of the executive, legislative, and judicial branches of the Federal Government ... shall be subject to, and comply with, all Federal, State, interstate, and local requirements, administrative authority, and process and sanctions respecting the control and abatement of

water pollution in the same manner, and to the same extent as any nongovernmental entity including the **payment of reasonable service charges**.... This subsection shall apply notwithstanding any immunity of such agencies, officers, agents, or employees under any law or rule of law.

33 U.S.C. § 1323 (emphasis added).

The RCRA provides, in pertinent part, that

Each department, agency, and instrumentality of the executive, legislative, and judicial branches of the Federal Government ... shall be subject to, and comply with, all Federal, State, interstate, and local requirements, both

In evaluating these arguments, this court began by noting that to resolve the issues before it,

> [t]he court must determine whether (i) the federal statutes at issue constitute a waiver of the United States' sovereign immunity from State-assessed taxes and if not, whether the regulatory charges sought by the NYDEC are (ii) impermissible taxes assessed against the United States or (iii) unreasonable regulatory charges for which the defendant is not liable.

*NYDEC,* 772 F.Supp. at 96.

With respect to the first issue, the court stated that

> "[w]aivers of immunity must be 'construed strictly in favor of the sovereign,' ... and not 'enlarge[d] ... beyond what the language requires.'" *Ruckelshaus v. Sierra Club,* 463 U.S. 680, 685, 103 S.Ct. 3274, 3278, 77 L.Ed.2d 938 (1983) (citations omitted). Moreover, "[a] waiver of sovereign immunity 'cannot be implied but must be unequivocally expressed.'" [*U.S. v.*] *Mitchell,* 445 U.S. [535] at 538, 100 S.Ct. [1349] at 1351, 63 L.Ed.2d 607 (quoting *United States v. King,* 395 U.S. 1, 4, 89 S.Ct. 1501, 1503, 23 L.Ed.2d 52 (1969)).

*Id.* at 97.

After carefully reviewing the decisions of other courts that had considered the scope and breadth of the waivers contained in the CWA and the RCRA, this court held that

> [b]oth of these statutes direct the United States to comply with all state requirements relating to the acquisition of environmental permits, emission standards imposed on facilities, and other related state pollution regulations. However, **these statutes are not blanket waivers of the United States' sovereign immunity from the imposition and assessment of taxes by a State.** Indeed, the pertinent portions of these statutes never even mention the word "taxes" when referring to the obligations of the United States. Congress has specifically subjected the federal government to the payment of the state taxes

substantive and procedural ..., respecting control and abatement of solid waste or hazardous waste disposal in the same manner, and to the same extent, as any person is sub-

in prior statutes, including one environmental statute. It has not done so here.

*Id.* at 98 (emphasis added).

Based upon this conclusion, the court rejected NYDEC's argument that the CWA and the RCRA constituted unlimited waivers of the United States' sovereign immunity from taxes and other assessments. *NYDEC,* 772 F.Supp. at 98; *see also State of Maine v. Department of Navy,* 973 F.2d 1007, 1012 (1st Cir.1992) (United States' waiver of sovereign immunity under the RCRA extends only to reasonable fees).

The court then went on to discuss the second issue—whether these regulatory charges constituted impermissible taxes from which the United States was immune or reasonable regulatory charges for which the United States was liable. *Id.* at 98–99. In making this determination, the parties and the court agreed that the proper test was the one set forth in *Massachusetts v. United States,* 435 U.S. 444, 98 S.Ct. 1153, 55 L.Ed.2d 403 (1978). Paraphrasing the *Massachusetts* court, this court stated that

> [The Federal Government] can have no constitutional objection to a revenue measure that satisfies the three-prong test of *Evansville–Vanderburgh Airport Authority v. Delta Airlines, Inc.,* [405 U.S. 707, 92 S.Ct. 1349, 31 L.Ed.2d 620 (1972) ].... So long as [ (1) ] the charges do not discriminate against [Federal] functions, [ (2) ] are based on a fair approximation of use of the system, and [ (3) ] are structured to produce revenues that will not exceed the total cost to the [State] Government of the benefits to be supplied, there can be no substantial basis for a claim that the [State] Government will be using its taxing powers to control, unduly interfere with, or destroy [the United States'] ability to perform essential services.

*Id.* at 99 (quoting *Massachusetts,* 435 U.S. at 466–67, 98 S.Ct. at 1167, 55 L.Ed.2d 403).

The United States and NYDEC conceded that the regulatory charges met the first

ject to such requirements, **including the payment of reasonable service charges....**
42 U.S.C. § 6961 (emphasis added).

prong of the *Massachusetts* test because there was no evidence of any discrimination on the part of NYDEC concerning enforcement of these regulations. The parties, however, disputed whether these charges met the second and third prongs of this test. With respect to the third prong, the United States claimed that the State had used the money received from these charges in an improper manner which demonstrated that the fees charged by NYDEC were tax-like exactions. *Id.* at 100. To the contrary, NYDEC argued, and the court agreed, that the third prong of the test does not require the court to inquire into the manner in which a government uses the revenue obtained by such assessments. *Id.* at 101. Rather, the court held that the third prong merely requires that the fee schedule developed by the State may not be structured in a manner such that the revenues received by such charges would exceed the total cost to the State of the benefits supplied. *Id.* Applying this test to the record before it, the court found that "[t]he receipts from these regulatory fees have clearly not been designed to, and indeed such charges do not in practice, exceed the cost to the State of providing the environmental programs offered by the NYDEC." *Id.* Accordingly, the court concluded that NYDEC had demonstrated that its regulatory charges met the third prong of the *Massachusetts* test. *Id.*

With respect to the second prong of the test; i.e., that the fees are based upon a fair approximation of the use of the system, the United States argued that because NYDEC's method of assessing the fees was based upon the size or quantity of a facility's operations and not upon the services afforded to that facility by NYDEC, the charges were presumptively invalid. *See NYDEC,* 772 F.Supp. at 99. To the contrary, NYDEC asserted, and the court agreed, that the United States' argument was based upon a misinterpretation and incorrect application of the second prong of the test. *See id.* In this regard, the court stated that

> [t]he *Massachusetts* Court made clear that the relevant inquiry regarding the second prong is not whether the charges assessed by a State exceed the **specific services** rendered to a facility by the government.

Rather, this prong relates to the **overall benefits a facility receives** from the government's services. In fact, the Supreme Court noted that this portion of the test is not failed even when a particular entity receives no specific services from the government at all.

*Id.* at 99–100 (emphasis added).

Thus, this court concluded that "[t]he assessed charges may be a fair approximation of the cost of the benefits **received by the United States** in the present case **even though such fees are greater than the dollar value of the specific services provided to the ten facilities** by the NYDEC." *Id.* at 100 (emphasis added). The court explained further that

> [t]he benefits received by the United States and its facilities concerning the environmental programs offered by New York are **not limited to the specific services rendered by the NYDEC to the subject facilities.** Rather, the federal government also benefits from EnCon's services because the NYDEC's programs and services are available for the United States' use if the same are needed by it in the future.

*Id.* (emphasis added).

The only evidence that the United States proffered in support of its position respecting this second prong of the test indicated that the dollar value of the specific services NYDEC provided to the federal facilities was less than the charges NYDEC assessed to these facilities. *See id.* at 100. The court, however, found this evidence insufficient because

> [t]here is no evidence before the court as to the value of the **overall** benefits the facilities receive in light of the programs and services made available to them by EnCon should the need for such assistance ever arise. Consequently, at the present time, this court cannot rule, as a matter of law, that the fees charged by the NYDEC do not fairly approximate the overall benefits received by the subject entities. Therefore, the [United States] has failed to establish that the subject charges meet

[sic] the second prong of the *Massachusetts* test.

*Id.* at 100 (emphasis in original).[4]

Thus, the court concluded that it could not decide, as a matter of law, whether the assessed charges were permissible fees or impermissible taxes under the *Massachusetts* test. Accordingly, the court denied both parties' motions based upon the application of this test to the regulatory charges at issue.

Alternatively, the court stated that "[t]he United States will still be entitled to summary judgment dismissing [NYDEC]'s complaint, and directing EnCon to reimburse the United States for the amount the [United States] has already paid the NYDEC, if this court determines that the assessed charges are unreasonable as a matter of law." *Id.* at 101. The court noted that its determination of this issue rested upon whether there was a reasonable relationship between the assessed charges and the services provided by NYDEC. *See id.* at 102. In this regard, the court found that

> [t]he mere fact that the dollar value of the specific services rendered to the subject facilities is less than the regulatory fees charged by the plaintiff is not dispositive of the issue of whether such fees are unreasonable. The federal entities also benefit from the NYDEC's services because such programs and services are available for the defendant's use if they are needed in the future and provide benefits to all users statewide.

*Id.* at 102.

Therefore, the court held that because neither party had submitted any evidence that

compared the value of the overall benefits **received by the United States** concerning these programs and services to the total cost to the State of providing the same **to the subject federal facilities,** it could not hold that "[t]he charges assessed against the entities by the State are unreasonable—or reasonable—as a matter of law." *Id.* at 102. Accordingly, the court denied both parties' motions for summary judgment on the issue of the reasonableness of the assessed charges. *See id.* at 102.

### *DISCUSSION*

As a result of this court's previous decision, the only issue that remains to be resolved by these cross-motions is whether NYDEC's charges satisfy the second prong of the *Massachusetts* test; i.e., that the charges are based upon a fair approximation of the use of the system.[5] The United States argues that NYDEC's regulatory charges violate the Supremacy Clause because, whether they are called taxes or unreasonable service charges, they constitute tax-like exactions. This is so, argues the United States, because they are not based upon a fair approximation of the cost of the services rendered to the United States by NYDEC. *See* United States' Memorandum of Law at 5. In support of this argument, the United States submitted data comparing the regulatory charges assessed against the ten federal facilities to the cost of the specific services rendered by NYDEC to these facilities.[6] The problem with this data, however, is that it is the same information that the court previously determined was insufficient to sat-

---

4. In reviewing its previous decision, the court realized that it inadvertently had failed to include the words "do not" before the word "meet" in the last sentence of the above-quoted passage. This sentence should read "Therefore, the [United States] has failed to establish that the subject charges do not meet the second prong of the *Massachusetts* test."

5. Since the court has already determined that NYDEC's charges satisfy the first and third prongs of the *Massachusetts* test, a decision that they satisfy the second prong would lead to the conclusion that these charges are reasonable. In that case, the United States would be required to pay, the charges because, as the United States concedes, pursuant to the CWA and RCRA, the

United States has waived its sovereign immunity to the limited extent that it is required to pay "reasonable service charges."

6. The United States compiled these figures from sixty-three pages of computerized raw data and estimates which NYDEC provided in response to the United States' interrogatory # 7 regarding the cost of such services. These sixty-three pages of data included information concerning the identification of the federal installations, the type of service performed, the year in which the service was performed, the identity of the person who performed the service, the amount of time spent, and the cost of performing the service. *See* United States' Memorandum of Law at 12.

isfy the second prong of the *Massachusetts* test. *See NYDEC,* 772 F.Supp. at 99. Although the United States acknowledges that the data is the same, it attempts to circumvent this problem by relying upon the deposition testimony of Mr. Middelkoop and Mr. Campbell to demonstrate why this data is, in fact, dispositive.[7]

Mr. Middelkoop testified that NYDEC's waste program provided regulated entities with five benefits or services and that the United States' Interrogatory # 7 was inclusive of all these activities. *See* United States' Memorandum of Law at 17, 32–33 (citing Middelkoop Deposition at 14–20, 27–28). In addition, Mr. Middelkoop conceded that, for a particular regulated entity, he could not place a dollar value on NYDEC's waste program's five benefits and services. *See id.* (citing Middelkoop Deposition at 38). Likewise, Mr. Campbell testified at his deposition that NYDEC's water program provided regulated entities with four benefits or services and that the United States' Interrogatory # 7 was inclusive of all these activities. *See id.* (citing Campbell Deposition at 28–33). In addition, Mr. Campbell conceded that, for a particular regulated entity, he did not know a method for quantifying NYDEC's water program's four benefits and services. *See id.* at 17–18 (citing Campbell Deposition at 37–38).

According to the United States, this deposition testimony demonstrates that "[t]here are **no new, different** benefits. In actuality, the **specific services are the same as the overall benefits; the services are the benefits.**" *See id.* at 30 (emphasis added). Therefore, the United States asserts that its comparison of the cost of the services rendered to the fees assessed "[i]s decisive and indeed determinative: New York's waste and water regulatory charges have been excessive and unreasonable and hence have violated the Supremacy Clause." *See id.*

■ It may very well be, as the United States contends, that "the services are the benefits." Nonetheless, the court cannot agree with the United States' assertion that

because the cost of the specific services actually rendered to its facilities is less than the fees charged to these facilities, the regulatory charges are unreasonable. To do so would require the court to ignore the Supreme Court's decision in *Massachusetts.* In that case, the Court very clearly stated that the second prong of the test is not failed even when a particular entity receives **no specific service** because "[e]ven ... if [the specific entity] ha[s] never received specific services from [NYDEC, it still] benefit[s] from them in the sense that the services are available for [its] use if needed ..." *Massachusetts,* 435 U.S. at 468, 98 S.Ct. at 1167–68, 55 L.Ed.2d at 421 (emphasis added). Therefore, even though the United States has demonstrated that there is not a 1:1 relationship between the cost of the services actually provided to its facilities and the amount of fees assessed to these same facilities, such proof is not dispositive of the issue of whether these regulatory charges are based upon a fair approximation of the use of the system.

■ NYDEC, of course, contends that its regulatory charges satisfy the second prong of the *Massachusetts* test. *See* NYDEC's Memorandum of Law at 4. In support of this argument, NYDEC asserts that, pursuant to its fee schedule, similarly classified entities are required to pay fees based upon the relative size of their waste or water related operations. *See* NYDEC's Memorandum of Law at 4. This method is used, NYDEC contends, because under its regulatory programs it bestows greater amounts of such services upon those entities that are required to pay the larger fees. *See id.* at 5–6. To support these assertions, NYDEC relies upon the affidavits of Mr. Haggerty, Mr. Campbell, and Mr. Middelkoop.

With respect to generator fees, under NYECL § 72–0402(1), the flat fees assessed increase in stages in relation to the amount of hazardous waste generated. In his affidavit, Mr. Middelkoop states that the regulatory services provided to generators fall, primarily, into three categories: (a) capacity assurance services; (b) waste reduction ser-

---

7. At the time of his deposition, Mr. Middelkoop was the head of NYDEC's hazardous waste program and Mr. Campbell was the person with the broadest and longest knowledge of NYDEC's water program. *See* United States' Memorandum of Law at 17.

vices; and (c) storing, reporting, labeling, and shipping services. *See* Middelkoop Affidavit at ¶ 5. Moreover, Mr. Middelkoop states that these services increase, generally, in proportion to the amount of waste that is generated. *See id.* at ¶¶ 8, 9, 12, 13, 15, 17, 19. Similarly, with respect to waste facility fees, pursuant to NYECL § 72–0402(2), the flat fees increase in stages in relation to the size of the operation. *See* NYDEC's Memorandum of Law at 14. With respect to the services provided under this program, Mr. Middelkoop asserts that they also increase, generally, in proportion to the size of the operation. *See* Middelkoop Affidavit at ¶¶ 26–40.

Pursuant to NYECL § 72–0502, which governs Waste Transporters, the transporter fees are based upon the source and quantity of the waste transported. *See* NYDEC's Memorandum of Law at 16. With respect to the services provided to these transporters, Mr. Haggerty states, in his affidavit, that

> [b]ecause hazardous waste is mostly generated by commercial and industrial entities, until June 21, 1989, the fees under Article 72, Title 5 were twice as high for transporters of industrial-commercial waste as the fees for transporters of other waste. That differential is a fair approximation of the differential in NYSDEC's costs of providing the regulatory services under ECL Article 27, Title 3, because such services were provided mostly to transporters of waste which was hazardous waste.

*See* Haggerty Affidavit at ¶ 5.

Finally, with respect to waste water facilities fees, pursuant to NYECL § 72–0602, the facilities are classified based upon whether the waste water they discharge is industrial, municipal or P/C/I and within each class the fees increase based upon the amount of waste water discharged. *See* NYDEC's Memorandum of Law at 16–17. According to Mr. Campbell, the services provided to such facilities include (a) permitting and plan review; (b) surveillance activities; and (c) compliance activities. *See* Campbell Affidavit at ¶¶ 4–6. Mr. Campbell also states that the amount of services provided generally is largest for industrial and municipal facilities and that it also increases in proportion to the

amount of waste water discharged annually. *See id.*

Based upon this affidavit testimony, NYDEC argues that it has demonstrated that there is a correlation between the various fees and services bestowed, in that, overall, the facilities with the largest amounts of services pay the most in fees. *See* NYDEC's Opposition Memorandum of Law at 11. Accordingly, NYDEC asserts that this data demonstrates the "rough approximation" necessary to establish that its fees are reasonable under the second prong of the *Massachusetts* test. *See id.* at 10–11.

The United States' response to NYDEC's reliance upon these affidavits is that they include generalizations and conclusory allegations that are insufficient to withstand a motion for summary judgment. *See* United States' Answering Brief at 7. The court disagrees. The affidavits in question provide explanations for the reasons **why** the larger entities require more of NYDEC's services and, therefore, why the fees assessed to such facilities are higher. One example will suffice to demonstrate this point. In the course of explaining the steps involved in an inspection of a hazardous waste generators' facility, Mr. Middelkoop asserts that

> [t]he inspection includes a visit to the generator's place of business. During the visit, DEC inspects the generator's plant and processes. In the course of the inspection, DEC's inspector must ascertain, *inter alia:* whether the generator is complying with its required plan for the reduction of the amount of hazardous waste which it generates; whether the hazardous waste which is being temporarily stored at the plant is being properly stored; whether the generator is in compliance with any applicable consent order; and whether the generator's plant or process has changed since the last inspection. **The amount of services which DEC provides to generators in the course of the inspection is, generally, proportional to the amount of hazardous waste which the generator generates.**

. . . . .

Part II sets out the requirements of the inspection which DEC's inspector must perform for each category of generator in part I, and the amount of information which the inspector must ascertain. . . .

**The reason that so much more information is required from generators as they generate larger quantities of hazardous waste is that there are more requirements in the regulations because** the size of the plant, the complexity of the process, the risk to the environment and the amount of records which must be reviewed is, usually, proportional to the quantity of hazardous waste generated. In addition, large quantity generators generally have several units which generate hazardous waste. Thus, they generally have more waste streams and more points at which hazardous waste is generated.

*See* Middelkoop Affidavit at ¶¶ 17, 19, 20 (emphasis added). As this example demonstrates, these explanations are more than conclusory assertions and, as such, are sufficient to withstand the United States' motion.

In recent years, several courts, including most recently the Supreme Court, have had the opportunity to address the issue of what constitutes a "fair approximation of the use of the system" for purposes of the *Massachusetts* test. The only conclusion that emerges from a review of these cases is that there is no single quantitative definition of this term. Rather, its contours depend upon the specific facts presented by the case at bar. Nonetheless, these decisions do offer some insight into the reasoning courts have used to make their determinations.

In *State of Maine v. Department of Navy,* 973 F.2d 1007 (1st Cir.1992), the record before the court consisted of documents that showed that Maine's

[H]azardous Waste Fund spent, for enforcement and licensing costs, $177,000 in 1984, $259,000 in 1985, and $245,000 in 1986. During that time, waste producers in Maine paid fees and assessments amounting to $196,000 (1984), $193,000 (1985), and $249,000 (1986). The record also contains documents indicating that in the three years 1985, 1986, and 1987, the Navy's assessed fees amounted to $54,500,

while Maine's estimate of the cost of state regulatory activities related to the Navy's Kittery shipyard amounted to $61,000. These documents suggest a rough relation between state regulatory costs and the fees charged. And, such a rough relation is sufficient to show that a state regulatory charge is a reasonable and permissible fee, and not an impermissible "tax" on a federal installation.

*State of Maine,* 973 F.2d at 1013 (citing *Massachusetts v. United States,* 435 U.S. at 468–69, 98 S.Ct. at 1167–68; *San Juan Cellular [Telephone Co. v. Public Service Com'n of Puerto Rico],* 967 F.2d [683] at 687 [(1st Cir., 1992)]; *New York State Dep't of Envtl. Conservation,* 772 F.Supp. at 100).

In support of its position that these service charges were unreasonable, the Navy argued (1) that much of the state Fund pays for a spill response team, whose work provides a general benefit to the public; (2) that the state response team has never responded to a spill at the shipyard; and (3) that the state's regulatory fees are not proportionate to regulatory costs because Maine also receives annual grants from the EPA to help finance the costs of the program. *See id.* at 1013–14. Although the court found these arguments unconvincing, it, nevertheless, concluded that "[t]he sparse record before us, in its present form, does not entitle the Navy, as a matter of law, to judgment on its claim that the state's fees are unreasonably high." *Id.* at 1014.

In *Brock v. Washington Metro. Area Transit Auth.,* ("WMATA") 796 F.2d 481 (D.C.Cir.1986), *cert. denied,* 481 U.S. 1013, 107 S.Ct. 1887, 95 L.Ed.2d 494 (1987), the Washington Metropolitan Area Transit Authority ("WMATA") stopped contributing to a Special Fund to which the District of Columbia's workers compensation regime required all employers to contribute and from which the Secretary of Labor made a variety of payments to injured workers. The court held that WMATA enjoyed neither constitutional nor compact immunity from the obligation to make payments to the Fund. *Id.* at 482. It also held that "[a]s to the intergovernmental tax immunity doctrine, under *Massachusetts v. United States,* 435 U.S.

444, 98 S.Ct. 1153, 55 L.Ed.2d 403 (1978), the obligation is properly characterized as a user fee, not a proscribed tax." *Id.*

With respect to the "fair approximation" prong of the *Massachusetts* test, WMATA argued that it had historically paid into the Fund more than its fair share of the Fund's costs and that its assessments had been significantly higher than the Fund's payouts to WMATA employees. *See id.* at 485 (citing WMATA's Brief at 22–23). With respect to this argument, the court held that

> [t]he allegation of *historical* disproportionality of costs and benefits is hardly dispositive of the question at issue. *Massachusetts* did not hold that a user fee must represent retrospectively a close approximation of the actual, historical benefit to the user. Rather, *Massachusetts* **held only** that the **method used to calculate the fee must rationally be designed to approximate prospectively the benefit to the user.**

*WMATA,* 796 F.2d at 485 (emphasis added).

The court went on to explain that

> [t]he levy held constitutional in *Massachusetts* illustrates this meaning of "fair approximation." The fee was a flat registration tax for all civil aircraft, introduced to help finance federal aviation programs; **the amount of the fee was based on the size and type of aircraft, but not the aircraft's actual use of the airways or the facilities and services supplied by the United States.** Massachusetts sought exemption for aircraft it owned and used exclusively for police functions. The Court rejected the state's plea.
>
> The *Massachusetts* opinion acknowledged that a fee based on actual use would measure the benefit to the user more accurately. The Court emphasized, however, that an actual use measurement method would be more costly to administer. Furthermore, the Court observed, the measurement method employed does bear a fair relationship to the benefit: bigger planes are more expensive for the federal safety system to accommodate. Finally, the Court noted that all users receive certain ambient or indirect benefits from the federal aviation system: the federal servic-

es are available to, and make the airspace safer for, all users.

*WMATA,* 796 F.2d at 486 (emphasis added) (citing *Massachusetts,* 435 U.S. at 468–69, 451 n. 9, 98 S.Ct. at 1167–68, 1159 n. 9).

Applying *Massachusetts* to the record before it, the court in *WMATA* held that

> [t]he present method of calculation, moreover, does bear a fair relationship to the benefit. The assessment is based on the employers' direct workers' compensation liabilities; employers who make more direct payments **most probably have** more employees who make "second injury" claims on the Special Fund, for such employers **are likely to have** more employees, more handicapped employees, less safe working conditions, or some combination of these three characteristics.
>
> Finally, like the *Massachusetts* registration tax, the Fund provides certain ambient or indirect benefits to each employer over and above actual payouts to the employer's workers.

*Id.* at 486 (emphasis added).

The *WMATA* court also found unconvincing WMATA's assertion that even allowing for these indirect benefits, its contributions to the Fund historically had exceeded the benefits WMATA and its employees had received from the Fund. With respect to this argument, the court held that

> [t]he argument does not carry the weight WMATA ascribes to it. The possibility that a state instrumentality may be somewhat overcharged for the benefits it receives from a federal program poses no threat of undue federal encroachment upon a state's domain as long as the charge imposed is nondiscriminatory and represents a 'fair approximation' of the benefits received.

*Id.* at 486–87 (citing *Massachusetts,* 435 U.S. at 466, 98 S.Ct. at 1167).

Based upon these findings, the court held that the WMATA could not claim constitutional immunity from the Special Fund assessments. *Id.* at 487.

Most recently in *Northwest Airlines, Inc. v. County of Kent,* —— U.S. ——, 114 S.Ct. 855, 127 L.Ed.2d 183 (1994), the Supreme

Court had the opportunity, once again, to assess the reasonableness of a governmental assessment pursuant to. the test it originally established in *Evansville–Vanderburgh Airport Auth. Dist. v. Delta Air Lines, Inc.*, 405 U.S. 707, 92 S.Ct. 1349, 31 L.Ed.2d 620 (1972).[8] In *Northwest Airlines*, the Airlines contended that the Airport's fee structure failed all three prongs of the *Evansville* test.[9] *Id.*, —— U.S. at ——, 114 S.Ct. at 864, 127 L.Ed.2d at 196. With respect to the prong of the test at issue here—that the fee is based upon some fair approximation of the use of the facilities—the Airlines argued that "[t]he concessions benefit substantially, albeit indirectly, from air operations, because those operations generated the concessions' customer flow." *Id.*, —— U.S. at ——, 114 S.Ct. at 864, 127 L.Ed.2d at 196. Therefore, the Airlines asserted that "[t]he Airport's failure to allocate to the concessions any of the airfield-associated costs violated [this prong of the test.]" *Id.*, —— U.S. at ——, 114 S.Ct. at 864, 127 L.Ed.2d at 196.

The Supreme Court rejected this argument stating that it saw "[n]o obvious conflict with *Evansville* in the Airport's allocation of the costs of air operations to the Airlines and general aviation, but not to the concessions. *Id.*, —— U.S. at ——, 114 S.Ct. at 864, 127 L.Ed.2d at 196. The court explained that

> [o]nly the Airlines and general aviation actually use the runways and navigational facilities of the Airport; the concessions use only the terminal facilities. The Air-

port's decision to allocate costs according to a formula that accounts for this distinction appears to "reflect a fair, if imperfect, approximation of the use of facilities for whose benefit they are imposed." *Northwest Airlines*, —— U.S. at ——, 114 S.Ct. at 864, 127 L.Ed.2d at 197 (quoting *Evansville*, 405 U.S. at 716–17, 92 S.Ct. at 1355) (footnote omitted).

In addition, the Court noted that the district court, with one minor exception, had found that the Airport charged the Airlines "the break-even costs for the areas they use." *Id.*, —— U.S. at ——, 114 S.Ct. at 864–65, 127 L.Ed.2d at 197 (quoting *Northwest Airlines, Inc. v. County of Kent*, 738 F.Supp. 1112 at 1119 (1990)) (footnote omitted). Under such circumstances, the Court held that it "[could not] conclude that the Airlines were charged fees 'excessive in comparison with the governmental benefit conferred' " *Id.*, —— U.S. at ——, 114 S.Ct. at 865, 127 L.Ed.2d at 197 (quoting *Evansville*, 405 U.S. at 717, 92 S.Ct. at 1355) (other citation omitted). Thus, the Court upheld the Circuit Court's determination that the fees were not unreasonable under the Anti–Head Tax Act ("AHTA"), 49 U.S.C.App. § 1513.

■ As the above-cited cases demonstrate, the second prong of the *Massachusetts* test does not require an exact correlation, in terms of dollars and cents, between the costs of the overall services provided and the fees assessed for such services. Nor does it require that a governmental entity adopt a

---

8. The *Evansville* test is the three-prong test relied upon by the Supreme Court in *Massachusetts* and which courts have referred to, since that time, as the *Massachusetts* test.

9. Pursuant to its accounting system, known as the Buckley Method,

> [t]he Airport first determines the costs of operating the airfield and the passenger terminal, and allocates these costs among the users of the facilities. Costs associated with airfield operations (e.g., maintaining the runways and navigational facilities) are allocated to the Airlines and general aviation in proportion to their use of the airfield. No portion of these costs is allocated to the concessions. Costs associated with maintaining the airport terminal are allocated among the terminal tenants— the Airlines and the concessions—in proportion to each tenant's square footage.
>
> The Airport then establishes fees and rates for each user group. It charges the Airlines

100% of the costs allocated to them, in the form of aircraft landing and parking fees (for use of the airfield), and rent (for the terminal space the Airlines occupy). General aviation, however, is charged at a lower rate. The Airport recovers from that user group a per gallon fuel flowage fee for local aircraft and a landing fee for aircraft based elsewhere. These fees account for only 20% of the airfield costs allocated to general aviation.

In relation to costs, the Airport thus "undercharges" general aviation. At the same time, measured by allocated costs, the Airport vastly "overcharges" the concessions. ... The surplus offsets the general aviation shortfall of approximately $525,000 per year, and has swelled the Airport's reserve fund by more than $1 million per year.

*Northwest Airlines*, —— U.S. at ——, 114 S.Ct. at 859–60, 127 L.Ed.2d at 190–91 (footnotes omitted).

formula that results in a 1:1 relationship between the actual use of the services by a particular entity and the cost of providing those services to that entity. Rather, it requires only a rational relationship between the method used to calculate the fees and the benefits available to those who pay them.

█ In the present case, NYDEC has demonstrated the existence of such a relationship: larger facilities are more expensive to regulate and require more services than smaller facilities.[10] In addition, all services which NYDEC provides pursuant to these regulatory programs, whether used or not, are available to the United States should they be needed in the future. The fact that the United States may seldom require such services, or for that matter may never need them, does not render the fees charged for these programs unreasonable. This evidence, coupled with the fact that the **total receipts** from these regulatory fees have been substantially less than the **actual costs** of these programs, demonstrates that NYDEC's method of calculating its waste and water regulatory charges results in a fair approximation of the cost of the use of the system. Therefore, the court holds that these regulatory charges meet all three prongs of the *Massachusetts* test and, hence, constitute **reasonable** fees, not tax-like exactions. Thus, the United States has waived its sovereign immunity under the CWA and RCRA to imposition of such fees and is liable for their payment. Accordingly, the court grants NYDEC's motion for partial summary judgment and denies the United States' motion for summary judgment.

IT IS SO ORDERED.

---

10. The parties disagree concerning which of them has the burden of proof with respect to the second prong of the *Massachusetts* test. Since NYDEC has demonstrated that its fees are reasonable, the court need not, and therefore declines to, decide this issue. The court notes, however, that case law exists which arguably would support the United States' assertion that NYDEC bears this burden. *See Holloman v. Watt,* 708 F.2d 1399, 1401 (9th Cir.1983), *cert. denied,* 466 U.S. 958, 104 S.Ct. 2168, 80 L.Ed.2d 552 (1984) ("The party who sues the United States bears the burden of pointing to such an unequivocal waiver of immunity."); *Alnor Check Cashing v. Katz,* 821 F.Supp. 307, 311 (E.D.Pa.), *aff'd,* 11 F.3d 27 (3d Cir.1993) ("Any party attempting to sue the United States bears the burden of proving that Congress has waived sovereign immunity."); *cf. State of New York v. United States,* 620 F.Supp. 374 (E.D.N.Y.1985) ("Our lack of jurisdiction over these claims is premised on plaintiff's failure to show any waiver of sovereign immunity ...").