**NEW HAMPSHIRE MOTOR TRANSPORT ASSOCIATION, et al., Plaintiffs, Appellees,**

v.

**Richard M. FLYNN, et al., Defendants, Appellants.**

No. 84–1226.

United States Court of Appeals, First Circuit.

Argued Sept. 5, 1984.

Decided Dec. 26, 1984.

Bruce E. Mohl, Asst. Atty. Gen., with whom Gregory H. Smith, Atty. Gen., and Douglas L. Patch, Asst. Atty. Gen., Div. of Legal Counsel, Concord, N.H., were on brief, for appellants.

Robert A. Hirsch, Atty., American Trucking Associations, Inc., Washington, D.C., with whom Roger C. Wendell, Jonathan D. Canter, Gray & Wendell, Boston, Mass., Grenville Clark, Wendell, Clark & Solomon, Manchester, N.H., were on brief, for appellees.

Before CAMPBELL, Chief Judge, BREYER, Circuit Judge, and SELYA,[*] District Judge.

BREYER, Circuit Judge.

The issue in this case is whether New Hampshire can lawfully require hazardous materials and waste transporters to obtain a state license for an annual fee of $25 or a single-trip fee of $15. We find that these fees do not violate the Constitution's Commerce Clause, U.S. Const., art. 1, § 8, cl. 3, nor are they preempted by a federal statute, Hazardous Materials Transportation Act, 49 U.S.C. § 1801, *et seq.* We therefore reverse a district court judgment holding them unlawful.

I

In 1975 Congress enacted the Hazardous Materials Transportation Act ("HMTA"), in part to replace a patchwork of sometimes conflicting state regulations with "a general pattern of uniform, national regulations." *National Tank Truck Carriers, Inc. v. Burke,* 608 F.2d 819, 824 (1st Cir. 1979). HMTA does not forbid states to regulate in a manner consistent with its objectives. *See* DOT Inconsistency Ruling IR–3, 46 Fed.Reg. 18918, 18919 (March 26, 1981) ("Congress did not intend ... to occupy the field of hazardous materials transportation so as to preclude any state or local action."); *cf.* 49 U.S.C. § 1811(a) (preempting any state requirement "inconsistent" with HMTA). In 1983 New Hampshire enacted New Hampshire Laws of 1983, Chapter 393, which, for the most part, simply required the state Commissioner of Safety to enforce within New Hampshire rules identical to the federal hazardous transportation regulations. Chapter 393, however, also imposes a $25 or $15 license fee requirement on any vehicle that carries enough hazardous materials or waste (typically, 1000 pounds) to fall within the federal rules requiring it to display a diamond-shaped hazardous materials "placard."

The parties have agreed that the licensing provisions will raise between $700,000

and $800,000 in annual revenue. The state will use about 5 percent of the money raised for certain transportation "response" programs; it will give 20 percent to its Department of Safety to help enforce Chapter 393; and it will contribute 75 percent to its Hazardous Waste Cleanup Fund.

Three trucking associations, appellees here, sued the state of New Hampshire to enjoin enforcement of Chapter 393. The federal district court granted an injunction because it believed that the Commerce Clause of the federal Constitution prohibited the state from assessing these license fees and that the fees were inconsistent with, and preempted by, the HMTA. New Hampshire appealed. After examining the record in the case with care, we reach a different conclusion than did the district court about this close question.

II

The critical Commerce Clause question in this case is whether the license fees can be justified as a "user fee" bringing the case within the scope of *Evansville-Vanderburgh Airport Authority Dist. v. Delta Airlines, Inc.,* 405 U.S. 707, 92 S.Ct. 1349, 31 L.Ed.2d 620 (1972), the leading Supreme Court case on the subject. The state argued below and in this court that the license fee amounts to such a "user" tax or fee, and that, under *Evansville,* the fee is constitutionally permissible. The truckers do not dispute the state's characterization of the fee, but they claim that it significantly impedes the flow of "interstate commerce," hence it is constitutionally forbidden. We conclude that *Evansville* dictates a finding in the state's favor.

In *Evansville,* the Supreme Court considered a New Hampshire law that required airlines using New Hampshire airports to pay the state a one dollar charge for each departing passenger. The state gave one half of the money it collected to the state's aeronautical fund, and it gave the other half "to the municipalities or the airport authorities owning the public land-

---

[*] Of the District of Rhode Island, sitting by designation.

ing areas...." *Id.* at 710, 92 S.Ct. at 1352. The Supreme Court, citing considerable precedent, held that a state can impose a "reasonable fee to help defray the costs" of state facilities upon "interstate and domestic users alike." *Id.* at 714, 92 S.Ct. at 1354. *See Clark v. Paul Gray, Inc.,* 306 U.S. 583, 59 S.Ct. 744, 83 L.Ed. 1001 (1939); *Ingels v. Morf,* 300 U.S. 290, 57 S.Ct. 439, 81 L.Ed. 653 (1937).

The Court noted that the state can impose a "flat fee" for the use of its roads "without regard to actual use by particular vehicles, so long as the fee is not excessive" when compared to the services the state provides those charged. In applying this standard, the Court pointed out, the challenger has the burden of proving that the fee is "unreasonable in amount for the privilege granted." The state has the benefit of the fact the Constitution requires not "precision" but "'rough approximation'" in matching fee and benefit. *Evansville-Vanderburgh Airport Authority Dist. v. Delta Airlines, Inc.,* 405 U.S. at 715–16, 92 S.Ct. at 1354–55, quoting *Harvester Co. v. Evatt,* 329 U.S. 416, 422, 67 S.Ct. 444, 447, 91 L.Ed. 390 (1947).

The Court found the airport fee constitutional for three reasons. First, although the "vast majority" of air passengers flew interstate, the charge in principle applied to both interstate and intrastate passengers. Second, although the fee applied to some, not all, airport users, it roughly, though imperfectly, helped to apportion costs fairly among airport users. Third, "the airlines have not shown these fees to be excessive in relation to costs incurred by the taxing authorities." *Evansville-Vanderburgh Airport Authority Dist. v. Delta Airlines, Inc.,* 405 U.S. at 717–19, 92 S.Ct. at 1355–56. The airlines argued that half of the revenues go directly to municipalities which might not use the money for airports. But, the Court held that it was "immaterial whether those funds are expressly earmarked for airport use." The issue is whether the *amount* of the funds received is "shown to exceed ... airport costs." *Id.* at 720, 92 S.Ct. at 1357.

The district court in this case has made no explicit factual findings about whether the revenue that the $25 and $15 licenses will raise is "excessive" in relation to the special services that New Hampshire provides hazardous materials and waste transporters (or to the special costs they impose upon New Hampshire). We have therefore examined the record ourselves, to determine whether it "permits only one resolution of the factual issue." *Pullman-Standard v. Swint,* 456 U.S. 273, 292, 102 S.Ct. 1781, 1791, 72 L.Ed.2d 66 (1982). *Compare id. with Bigelow v. Virginia,* 421 U.S. 809, 826–27, 95 S.Ct. 2222, 2234–35, 44 L.Ed.2d 600 (1975). The issue is whether the truckers have satisfied their burden of proving the fees constitutionally excessive in relation to costs. The record establishes that they have not.

The basic facts are not seriously disputed. The fees are expected to generate annual revenues of between $700,000 and $800,000. At the same time, the state must spend money to enforce the hazardous materials regulations. It must, for example, tell truckers what the rules are (it originally sent out notices to approximately 15,000 affected parties); it must inspect and license trucks; and it must train employees to carry out enforcement work. When a truck has an accident involving significant damage, the state sends employees to the scene to make out accident reports, to reroute or direct traffic away from the location of the accident, to inform the necessary state agencies which must then help to control the damage and clean up the spill, and to make certain that both people and surroundings will be properly protected. Such work is directly attributable to the transportation of hazardous substances within the state.

The record does not give precise figures about the costs of providing these services. It does provide evidence of three to five hazardous materials road spills per week, most but not all of which apparently involved "hazardous materials" trucks. It also shows that New Hampshire assigns two state troopers full time to hazardous materials work, although some part of

their time is spent on problems not directly related to transport. And it shows that each trooper costs the state $30,000 to $40,-000, plus equipment and initial training. Moreover, New Hampshire employs road safety inspectors, half of whom spend some significant portion of their time (15 percent to 25 percent, out of a total budget for all inspectors of over $600,000) on hazardous materials transportation. And, New Hampshire's more than 200 other state troopers occasionally inspect hazardous materials trucks or enforce the transport laws against violators.

The parties agree that with additional funds, that is, the $150,000 or so that Chapter 393 will make available, the Department of Safety intends to hire additional state troopers and safety inspectors and to purchase protective equipment, such as acid-proof suits and self-contained breathing apparatus. They also agree that the state would like to expand its training to include local police and firefighters and emergency ambulance crews.

In addition to the special state troopers and the safety inspectors, the record shows that the following departments have something to do with hazardous materials transport:

| Department | Annual Budget (As revealed in the record) |
| --- | --- |
| State Police | $9,000,000 |
| Road Toll Administration | 600,000 |
| Fire Marshal | 200,000 |
| Department of Safety: | |
| Data Processing | 2,600,000 |
| "Business Office" | 300,000 |
| Commissioner's Office | 200,000 |

In addition, the record shows that when a truck spills hazardous materials or waste, the following departments may become involved:

Bureau of Hazardous Waste
Water Supply and Pollution Control Commission
Fish and Game Department
Department of Public Works and Highways
Air Resources Agency
Civil Defense Agency
Radiological Health Agency
State Police Communications Bureau
Local police and fire departments

Finally, the record shows that between 15 and 25 percent of the motor carriers on the roads of New Hampshire at any given time are carrying hazardous materials.

■ In sum, the record shows a significant number of hazardous materials trucks and spills, and it shows that hazardous material transport imposes significant costs upon New Hampshire when the state seeks to prevent, or must deal with, the consequences of the spills. Moreover, it shows that the state does make significant prevention, enforcement, and clean-up efforts. The record does not offer a specific allocation of department costs among activities—between hazardous materials transport activities and other activities. The record is unsatisfactory in this respect because it is highly general and unspecific about particular costs. Nonetheless, the factual material that it does contain (unless refuted) shows, on conservative assumptions, that these state departments taken together devote enough time and effort to the transport problem to make fees raising $700,000 to $800,000 annually appear not "excessive" in relation to costs.

■ The reason we can say this, given the generally nonquantitative nature of the record, is that, legally speaking, *the burden of proving "excessiveness"* falls upon the truckers, not the state. *Evansville-Vanderburgh Airport Authority Dist. v. Delta Airlines, Inc.*, 405 U.S. at 719, 92 S.Ct. at 1356; *Capitol Greyhound Lines v. Brice*, 339 U.S. 542, 547, 70 S.Ct. 806, 809, 94 L.Ed. 1053 (1950). The truckers are responsible for producing a record sufficiently specific and detailed to allow the finding that they seek. Here, the truckers introduced no budget analyses; they did not trace the actual expenditures of the government departments allegedly involved. Instead, they submitted the case for the most part on a general, nonquantitative agreed statement of facts. The truckers did argue that some of the state's figures involved double-counting (of equip-

ment, for example, that is used for purposes in addition to hazardous materials transport problems). Yet we eliminated such double-counting in our examination of the record, and still several hundred thousand dollars of expenditures seems likely. Were the burden of proof on the state, we would remand this case for specific findings. Since the burden is on the truckers, however, the unrefuted plausibility of significant state expense is a fatal defect in their case.

 We suspect that the absence of a specific finding about whether the fees were "excessive" in relation to costs reflects the fact that the parties argued this case to the district court on somewhat different legal theories. This fact does not help the truckers, however, for we do not accept their views of the merits of those different legal theories. First, the truckers point out that 75 percent of the fee-generated revenues will be paid to New Hampshire's Hazardous Waste Cleanup Fund. Apparently, that fund primarily finances the cleaning up of toxic waste dumps and has relatively little to do with road transport. The district court accepted the truckers' argument that this fact—the fact that 75 percent of the money actually collected would not be spent on hazardous material transport—made the fees unlawful. We do not agree, however, because the Supreme Court explicitly stated in *Evansville* that what the fees themselves are *actually* spent on is irrelevant. The question is the relationship between the *amount* the fees raise and the *amount* the state likely spends. The Commerce Clause does not require states or courts to trace individual dollars. The Supreme Court said that

> so long as the funds received by local authorities under the statute are not shown to exceed their airport costs, it is immaterial whether these funds are earmarked for airport use. The State's choice to reimburse local expenditures through unrestricted rather than restricted revenues is not a matter of concern. . . .

*Evansville-Vanderburgh Airport Authority Dist. v. Delta Airlines, Inc.*, 405 U.S. at 720, 92 S.Ct. at 1357 (citations omitted). New Hampshire may reasonably see hazardous materials trucks as one of several hazardous material risk sources; it may pay some of the costs associated with all such sources out of a special fund, while paying other costs out of general revenues. It may finance its expenditures out of general revenues, special taxes, fees, grants, or in other ways. How and whom it charges, and how it allocates its revenues, is not here relevant unless the truckers can show that New Hampshire has burdened interstate commerce by charging truckers a fee that is excessive in relation to costs or to services provided. And, this they have failed to do.

 Second, the district court found that the charges did not "reflect a fair, if imperfect, approximation of the use of facilities for whose benefit they are imposed." *Id.* at 717, 92 S.Ct. at 1355. If this finding reflects the truckers' view of the significance of the fact that 75 percent of the revenue went to the hazardous waste cleanup fund, it cannot stand in light of our discussion above. If it is meant as an independent finding, it conflicts with our understanding of the *Evansville* opinion. As we read *Evansville*, the Court was responding there to a claim that those who embarked on airplanes (and paid a dollar) were being charged too high a share of the cost of the airport compared to others who also used it (those, for example, who landed in airplanes, or who changed planes at the airport). The Supreme Court found that the fee represented a reasonably fair allocation of airport costs among users. Here, assuming that the revenues generated by the fees are roughly equivalent to the services the state provides hazardous materials truckers or to the costs that they impose upon the state, there is simply no significant allocation question. The relevant expenditures are those made for, or on account of, the hazardous materials truckers; and there is no other group identified here who in fact ought to pay a

portion of that fee. As far as the record reveals, the allocation is reasonably fair.

■ Third, the truckers separately argue that if New Hampshire can impose these fees so can other states. If many or all states do so, the resulting fee system will greatly raise transport costs and seriously burden interstate commerce. There is a short answer to this claim, namely that the Commerce Clause does not prevent states from charging for services they provide. *See, e.g., Hendrick v. Maryland,* 235 U.S. 610, 624, 35 S.Ct. 140, 142, 59 L.Ed. 385 (1915). This answer is not totally satisfactory, however, for "burden of proof" rules mean that each state can charge an amount that cannot be *proved* excessive. The sum total of charges that cannot be *proved* excessive may well exceed the sum total of the *actual* cost of state services. Nonetheless, there is a conclusive answer to the argument here, for Congress has specifically delegated to the Department of Transportation ("DOT") the power to promulgate rules that preempt state law in this area. *See* HMTA, 49 U.S.C. § 1811(a). Should the circumstance that the truckers fear come to pass, a remedy is close at hand. DOT can promulgate a regulation prohibiting or controlling the imposition of excessive license fees. Under these circumstances, there is no practical reason to fear significant state barriers to interstate commerce and consequently there is no legal basis for departing from the "burden of proof" logic of *Evansville.* Since the fee is justified as a "user fee" under the test elaborated in that case, we need not consider whether it could also be justified as a general revenue tax under other case authority. *See Commonwealth Edison Company v. Montana,* 453 U.S. 609, 101 S.Ct. 2946, 69 L.Ed.2d 884 (1981); *Complete Auto Transit, Inc. v. Brady,* 430 U.S. 274, 97 S.Ct. 1076, 51 L.Ed.2d 326 (1977).

### III

The district court also accepted the truckers' claims that New Hampshire's license fee is inconsistent with, and hence preempted by, the HMTA. The Supreme Court has held that HMTA and the regulations that DOT issues under that statute preempt state law if 1) compliance with both state and federal law is not possible, or 2) if the state law erects a significant obstacle to accomplishing the objectives of that federal law. *See, e.g., Ray v. Atlantic Richfield Company,* 435 U.S. 151, 158, 98 S.Ct. 988, 994, 55 L.Ed.2d 179 (1978). We asked DOT to file an *amicus* brief expressing its views about this claim. It has done so, but it has not taken a position on the truckers' claim for two reasons.

First, DOT points out that it has adequate legal power to "correct" any harmful court decision in this area. If a court holds a state law preempted, the state can petition DOT to grant a waiver, which DOT will grant if the "state law affords an equal or greater level of protection" than the HMTA and "does not unreasonably burden commerce." 49 U.S.C. § 1811(b). If a court holds that a state law is not preempted, DOT can preempt that law simply by issuing a regulation. *National Tank Truck Carriers, Inc. v. Burke,* 608 F.2d at 823 n. 6. Thus, there is no pressing policy need for DOT to take a position in a federal court case involving other parties.

Second, and more important, DOT will provide interested persons with an advisory opinion about whether or not HMTA and its regulations preempt a particular state law or local regulation. Before providing its opinions, DOT builds an administrative record using notice and comment rulemaking procedures, *see* 5 U.S.C. § 553. Neighboring states, other interested parties, and members of the general public may provide comments. The result is a decision likely based on a more complete record and informed by greater expertise than is found in a court proceeding like the one before us. DOT feels that it does not want to encourage parties to circumvent this procedure by allowing them to obtain the same advice—without the administrative proceeding—by way of an *amicus* brief.

■ The district court may have felt inhibited from obtaining DOT's views by our holding in *National Tank Truck Carriers,*

*Inc. v. Burke,* 608 F.2d at 821–23, that the doctrine of primary jurisdiction does not require the parties first to go to the agency for an inconsistency ruling. Our ruling in that case, however, should be read with emphasis on the word "require." This court was responding to the argument that the district court *could not* decide the "inconsistency" issue first; and we responded that the district court *could* do so; we did not say it *must* do so. The district courts are free to encourage the parties to use DOT's procedure, to schedule proceedings to facilitate the parties' doing so, and, in appropriate cases, to use the "flexible tool" of primary jurisdiction to require their use of the agency first where doing so will expedite just resolution of the controversy. *Locust Cartage Co. v. Transamerican Freight Lines, Inc.,* 430 F.2d 334, 340 n. 5 (1st Cir.), *cert. denied,* 400 U.S. 964, 91 S.Ct. 365, 27 L.Ed.2d 383 (1970). *See Distrigas of Massachusetts Corp. v. Boston Gas Company,* 693 F.2d 1113, 1119 (1st Cir.1982). Indeed, in the *Burke* case itself, after remand from this court, the district court so scheduled further proceedings that it was able to take account of DOT's views on the "inconsistency" question. *National Tank Truck Carriers, Inc. v. Burke,* 535 F.Supp. 509, 512–14 (D.R.I.1982), *aff'd* 698 F.2d 559 (1st Cir.1983). We see no need here, however, to protract proceedings further to obtain DOT's opinion on the question before us. The parties have had a fair opportunity to build a record in the district court; the legal questions do not seem particularly difficult; to obtain DOT's views would require significant additional delay; and, as we have stated, DOT has adequate legal power in any event to alter the result.

The district court here found "inconsistency" because it believed that, inconsistent with an important federal objective, New Hampshire's licensing law created transportation delay. The specific delay in question arises from the fact that a trucker wishing to buy a $15 single-trip license can do so at the New Hampshire border stations only during regular office hours, apparently not at night or on weekends. Such a trucker would have to buy an annu-

al $25 license in advance or buy a $15 license earlier in the day or week. Because hazardous transport requests often come on short notice, trucking firms may not have enough previously licensed trucks, and the single-trip license stations may be closed when the shipper calls. Thus, in the district court's view, the system threatens to interfere with DOT's mandate that hazardous materials be transported "without unnecessary delay." 49 C.F.R. § 177.-853(a).

▮ We do not agree with the district court that the delay caused is significant enough to interfere with the federal speedy-transport mandate. Truckers can obtain single-trip licenses during ordinary business hours. Truckers foreseeing nighttime, or weekend, calls, can buy annual licenses for an additional $10. The possibility of delay arises only out of the fact that a shipper, wishing to have materials transported at night or on weekends, will find its choice restricted to those trucks that are already licensed. But precisely this type of delay is inherent in any state licensing scheme. Precisely this type of delay arises out of the licensing requirements that New Hampshire (and other states) imposes on all interstate motor carriers, *see* N.H. RSA 375–B:22; that is to say, the shipper must restrict its choice to truckers that are licensed to drive in New Hampshire. Yet, no one claims that such requirements are inconsistent with HMTA. In fact, the system here—because of the opportunity to obtain single-trip licenses most of the time—involves less delay than most. The district court distinguished these other licensing requirements on the ground that the license requirement here at issue, unlike the more general truck license requirement, discriminates against interstate commerce. That distinction, however, is no longer tenable, in light of our discussion in Part II. DOT has expressed its view in other cases that a "bare" permit requirement or license requirement is consistent with HMTA. DOT Inconsistency Ruling IR–3, 46 Fed.Reg. at 18924; DOT Inconsistency Ruling IR–2, 44 Fed.Reg.

75566, 75570 (December 20, 1979). We see here little, if any, impediment not inherent in the administration of any "bare" licensing scheme. And we therefore find no inconsistency.

At bottom, the truckers' objections to New Hampshire's license requirements rest upon added cost. We have already explained, however, why we find nothing unreasonable about the cost—or any unreasonable interference with federal objectives—on the basis of the record before us. And, the features of the record to which we pointed in our discussion of the Commerce Clause, *see* pp. 47–49, *supra*, lead us to conclude that there is no inconsistency between this license fee and any DOT regulations. Whether a different record, created before DOT, would lead, or would have led, to different conclusions is a matter we need not decide.

### IV

■■■■ Appellants also ask us to examine three other arguments that the truckers advanced in the district court in support of the injunction. The truckers argue that we should return the case to the district court to obtain its views on these issues. The truckers, however, have no legal right to such a district court examination. While the general rule is that a "federal appellate court does not consider an issue not passed on below," the Supreme Court has nonetheless stated that

> The matter of what questions may be taken up and resolved for the first time on appeal is one left primarily to the discretion of the courts of appeals, to be exercised on the facts of individual cases.... Certainly there are circumstances in which a federal appellate court is justified in resolving an issue not passed on below, as where the proper resolution. is beyond any doubt ... or where "injustice might otherwise result."

*Singleton v. Wulff,* 428 U.S. 106, 120–21, 96 S.Ct. 2868, 2877, 49 L.Ed.2d 826 (1976) (citations omitted). In this case, the truckers advanced and had full opportunity to argue the issues below; their trial brief on

these issues is in the record; the appellants briefed the issues in this court; and we see no reason to protract the litigation of these issues further by remanding the case for another decision and perhaps another appeal.

■■■■ In any case, these three arguments have little merit. First, the truckers argued that Chapter 393 conflicts with, and therefore is preempted by, the Interstate Commerce Act, 49 U.S.C. § 11506(b). That statute concerns state requirements for registering an Interstate Commerce Commission ("ICC") certificate—a federal certificate given to trucks that travel interstate. (Typically, states require truckers using their highways to register the certificate within the state and to display a decal as evidence that they have done so.) The provision in question says

> When a state registration requirement imposes obligations in excess of the standards [contained elsewhere in the ICC Act], the part in excess is an unreasonable burden.

The statute, however, refers to "registration" of ICC permits, not to license fees for trucks carrying hazardous materials. Nothing in the record before us suggests that this provision is relevant to this case.

■■■■ Second, the truckers argued that Chapter 393 gives inadequate notice of what they are required to do and therefore violates the Fourteenth Amendment, by depriving them of their "property" without "due process of law." As far as we can tell from the district court record, however, this argument is frivolous. The only ambiguity to which the truckers point is the statute's use of the word "vehicle." Does it mean that a truck which has a cab with an engine and, say, two semitrailers behind counts as one vehicle or two? The state points out that the statute means to count any truck with one motor as one truck. It has provided this interpretation and other explanations to each trucker likely to be affected. We can find no "notice" problem.

Third, the truckers claimed that the license fee violated the Fourteenth Amendment's Equal Protection Clause. This, and related arguments, however, simply constitute variations on their Commerce Clause theme and fail for similar reasons.

Finally, the truckers asserted various violations of the New Hampshire constitution. In the light of the Supreme Court's decision in *Pennhurst State School and Hospital v. Halderman,* — U.S. ——, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984), and the state's claim of immunity, those pendent state constitutional claims may be barred in a federal court proceeding by the Eleventh Amendment, U.S. Const., amend. XI. We need not decide that question, here, however, for it has not been briefed; and, the district court may well decide to dismiss the pendent claims in any event, in the exercise of its discretion to do so. *See United Mine Workers of America v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966).

*The injunction entered by the district court is vacated; its decision is reversed; and this case is remanded to the district court for further proceedings consistent with this opinion.*