218 F.3d 96 (2nd Cir. 2000)
 THOMAS C. JORLING, as Commissioner of the New York State Department of Environmental Conservation and NEW YORK STATE DEPARTMENT OF ENVIRONMENTAL CONSERVATION, Plaintiffs-Appellees,
v.
UNITED STATES DEPARTMENT OF ENERGY, JOHN S. HERRINGTON, as Secretary of the United States Department of Energy, U.S. DEPARTMENT OF TRANSPORTATION, UNITED STATES COAST GUARD, JAMES BURNLEY, IV, as Secretary of the United States Department of Transportation, PAUL A. YOST, Admiral Commandant of the United States Coast Guard, U.S. DEPARTMENT OF THE ARMY, JOHN O. MARSH, JR., Secretary of the United States Department of the Army, U.S. DEPARTMENT OF THE AIR FORCE, and EDWARD C. ALDRIDGE, JR., as Secretary of the United States Department of the Air Force, Defendants-Appellants.
 Docket No. 99-6188
August Term 1999
 UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT
 Argued: April 14, 2000
Decided: May 31, 2000
 
 Appeal from the June 3, 1999, judgment of the United States District Court for the Northern District of New York (Neal P. McCurn, Judge), imposing liability for hazardous waste regulatory charges assessed by New York Department of Environmental Protection against ten federal facilities.
 Affirmed.
 Robert H. Oakley, Washington, D.C. (Lois J. Schiffer, Asst. Atty. Gen., Environment and Natural Resources Div., David M. Thompson, John T. Stahr, U.S. Dept. of Justice, Washington, D.C., on the brief), for defendants-appellants.
 Maureen F. Leary, Asst. Atty. Gen., New York, N.Y. (Eliot Spitzer, N.Y. State Atty. Gen., Peter H. Schiff, Dep. Solicitor Gen., David A. Munro, Asst. Atty. Gen., Albany, N.Y., on the brief), for plaintiffs-appellees.
 Before: NEWMAN, KEARSE, and CABRANES, Circuit Judges.
 JON O. NEWMAN, Circuit Judge:
 
 
 1
 The issue on this appeal is whether certain hazardous waste regulatory charges imposed by New York on federal installations are "reasonable service charges" within the meaning of the provision of the Resource Conservation and Recovery Act that waives the sovereign immunity of the United States. See 42 U.S.C. 6961(a) (1994). The United States Department of Energy and others (collectively "USDOE") appeal from the June 3, 1999, judgment of the District Court for the Northern District of New York (Neal P. McCurn, District Judge), granting summary judgment to the New York State Department of Environmental Conservation and its commissioner (collectively "NYDEC"). The judgment imposed liability for hazardous waste regulatory charges assessed by NYDEC against ten federal facilities in New York, and denied USDOE's cross-motion for summary judgment. We conclude that the hazardous waste regulatory charges were properly determined to be "reasonable service charges," and we therefore affirm.
 
 Background
 
 2
 In January 1989, NYDEC brought four consolidated actions in New York State Supreme Court against USDOE to recover unpaid environmental program regulatory charges, including hazardous waste program and waste transporter program charges, assessed by the NYDEC against ten federal facilities from 1983 to 1989. USDOE counterclaimed for a refund of approximately $400,000 and related relief for regulatory charges already paid. These actions were subsequently removed to the District Court for the Northern District of New York.
 
 
 3
 The parties stipulated to the following relevant facts. At all relevant times, New York has had environmental conservation programs concerning waste pollution. In 1983, the New York legislature enacted and NYDEC began assessing hazardous waste program and waste transporter program charges, as detailed in N.Y. Envtl. Conserv. Law §§ 72-0402, 72-0502 (McKinney 1997 & Supp. 2000). From 1983 through 1989, the ten federal facilities received billing for these waste regulatory charges in the month of billing, and payment was due under state statute within thirty days.
 
 
 4
 From 1983 through 1984, all waste regulatory charges were deposited into the state's general revenue fund, which is primarily funded by tax revenues. From 1985 through 1988, half of the waste regulatory charges was deposited into the general revenue fund, and the other half was deposited into a special hazardous waste remedial fund (i.e., the New York State superfund). Starting in 1989, half of the waste regulatory charges was deposited into the New York State superfund, and the other half was deposited into a special environmental enforcement fund.
 
 
 5
 The parties stipulated to the following charges and payments for waste regulatory charges from 1983 to 1989:
 
 
 6
 Year Charges Payments
1983 70,954.79 70,604.79 
1984 112,833.56 112,833.56
1985 142,951.37 38,809.50 
1986 227,870.28 24,000 
1987 196,471.31 0
1988 197,250.00 0 
1989 215,260.27 0
 
 
 7
 NYDEC waived any claim for unpaid hazardous waste regulatory charges assessed prior to July 14, 1985. For the year 1985, NYDEC billed the annual regulatory charges in September 1985.
 
 
 8
 The District Court initially granted in part and denied in part cross-motions for summary judgment. SeeNew York State Department of Environmental Conservation v. United States Department of Energy, 772 F. Supp. 91 (N.D.N.Y. 1991) ("NYSDEC I"). The District Court explained that although section 6001 of the Resource Conservation and Recovery Act of 1976, Pub. L. No. 94-580, 90 Stat. 2795, 2821, as amended, 42 U.S.C. 6961(a) (1994) ("RCRA"), contains a waiver of the United States' sovereign immunity from suit concerning certain state requirements regarding hazardous waste, including the imposition of "reasonable service charges," section 6001 is not a "blanket waiver[] of the United States' sovereign immunity from the imposition and assessment of taxes by a State." NYSDEC I, 772 F. Supp. at 98. The District Court noted that the "parties agree that the proper test for this court to utilize in ascertaining whether the charges sought by the NYDEC are impermissible taxes or permissible fees was developed by the Supreme Court in Massachusetts v. United States, 435 U.S. 444 (1978)," NYSDEC I, 772 F. Supp. at 99, which we discuss infra.
 
 
 9
 Arguing that the waste regulatory charges were unreasonably high, USDOE asserted that in every year between 1983 and 1989, "total waste regulatory charges exceeded [NYDEC]'s actual services [to the ten federal facilities] by a ratio of approximately nine to one ($1,163,591.58 vs. $126,792.13)." Id.
 
 
 10
 The District Court denied both motions for summary judgment because neither party had submitted evidence "as to the value of the overall benefits the facilities receive in light of the programs and services made available to them by [NYDEC] should the need for such assistance ever arise." Id.at 100.
 
 
 11
 On subsequent cross-motions for summary judgment, the District Court granted NYDEC's motion for partial summary judgment and denied USDOE's motion for summary judgment. SeeNew York State Department of Environmental Conservation v. United States Department of Energy, 850 F. Supp. 132 (N.D.N.Y. 1994) ("NYSDEC II"). The District Court explained that Massachusetts "requires only a rational relationship between the method used to calculate the fees and the benefits available to those who pay them." Id.at 143 (emphasis added). The Court found such a relationship in this case because larger facilities are more expensive to regulate and require more services than smaller facilities. In addition, all services which NYDEC provides pursuant to these regulatory programs, whether used or not, are available to the United States should they be needed in the future . . . . This evidence, coupled with the fact that the total receipts from these regulatory fees have been substantially less than the actual costs of these programs, demonstrates that NYDEC's method of calculating its waste . . . regulatory charges results in a fair approximation of the cost of the use of the system.
 
 
 12
 Id. (footnote omitted).
 
 
 13
 The District Court subsequently denied USDOE's motion under Fed. R. Civ. P. 60(b), seeNew York State Department of Environmental Conservation v. United States Department of Energy, No. 89-CV-194, 1997 WL 797523 (N.D.N.Y. Dec. 24, 1997) ("NYSDEC III"), and, among other things, granted NYDEC's summary judgment motion against USDOE for almost all the unpaid environmental program regulatory charges, including unpaid waste regulatory charges, for 1986 through 1997, seeNew York State Department of Environmental Conservation v. United States Department of Energy, No. 89-CV-194(NPM), 1999 WL 369965, at *1 (N.D.N.Y. June 3, 1999) ("NYSDEC IV"). The District Court also declared "that the United States and its agencies are liable in the future for all regulatory fees assessed by [NY]DEC from 1998 onward that are consistent with N.Y. ECL Article 72 and the court's prior decisions in this matter." Id.
 
 
 14
 Final judgment was entered on June 3, 1999. USDOE appeals from the District Court's grant of summary judgment to NYDEC only as to waste regulatory charges.
 
 Discussion
 
 15
 The issue on this appeal is whether the waste regulatory charges are "reasonable service charges" under the RCRA. As amended, the RCRA provides that each department, agency, and instrumentality of the federal government
 
 
 16
 engaged in any activity resulting, or which may result, in the disposal or management of solid waste or hazardous waste shall be subject to, and comply with, all Federal, State, interstate, and local requirements, both substantive and procedural . . . , respecting control and abatement of solid waste or hazardous waste disposal and management in the same manner, and to the same extent, as any person is subject to such requirements, including the payment of reasonable service charges.
 
 
 17
 42 U.S.C. 6961(a) (emphasis added). In 1992, Congress clarified the scope of the waiver of sovereign immunity in this provision by adding the following language:
 
 
 18
 The United States hereby expressly waives any immunity otherwise applicable to the United States with respect to any such substantive or procedural requirement (including, but not limited to, any . . . reasonable service charge). The reasonable service charges referred to in this subsection include, but are not limited to, fees or charges assessed in connection with the processing and issuance of permits, renewal of permits, amendments to permits, review of plans, studies, and other documents, and inspection and monitoring of facilities, as well as any other nondiscriminatory charges that are assessed in connection with a Federal, State, interstate, or local solid waste or hazardous waste regulatory program.
 
 
 19
 Federal Facility Compliance Act of 1992, Pub. L. No. 102-386, § 102(a)(3), 106 Stat. 1505, 1505, codified at 42 U.S.C. § 6961(a). SeeH. R. Rep. No. 102-111, at 6 (1991) ("In providing for the payment by federal facilities of 'reasonable service charges,' the Committee reaffirms and clarifies existing language which requires that federal agencies pay those fees and charges which other persons are subject to under federal, state, interstate and local solid or hazardous waste regulatory programs.") reprinted in 1992 U.S.C.C.A.N. 1287, 1292.
 
 I. The Applicable Standard
 
 20
 The Massachusetts test. Although this case involves a state charge imposed on the federal government, USDOE has agreed that the test for determining the reasonableness of the charges is the one articulated by the Supreme Court inMassachusetts v. United States, 435 U.S. 444 (1978), in upholding a federal charge imposed on a state government.[1] In that case, Massachusetts challenged federal assessments on a state police helicopter pursuant to a registration tax on all civil aircraft flying in United States airspace. Seeid. at 452. In affirming the District Court's dismissal of the challenge, the Supreme Court set forth a three-part test: So long as the charges [1] do not discriminate against state functions, [2] are based on a fair approximation of use of the system, and [3] are structured to produce revenues that will not exceed the total cost to the Federal Government of the benefits to be supplied, there can be no substantial basis for a claim that the National Government will be using its taxing powers to control, unduly interfere with, or destroy a State's ability to perform essential services.
 
 
 21
 Id. at 466-67.
 
 
 22
 On appeal, USDOE does not dispute the first or third parts of the Massachusetts test. It acknowledges that NYDEC's waste regulatory charges are non-discriminatory and are not structured to produce revenues that will exceed the total cost to NYDEC of the benefits to be supplied. SeeBrief for Appellants at 22 n.10. USDOE disputes only the second part of the Massachusetts test, challenging the District Court's finding that no reasonable jury could find that the waste regulatory charges did not meet the "fair approximation" component of the Massachusettstest. USDOE argues that the charges cannot meet the "fair approximation" component because, by its calculations, the charges from 1983 to 1989 exceeded the cost of supplying the services actually received by a nine to one ratio.
 
 
 23
 Approximation of Use. The initial problem in determining whether the "fair approximation" component of the Massachusetts test has been met arises from uncertainty as to what the charges must fairly approximate. The uncertainty inheres in the differing phrases that the Supreme Court used in Massachusetts to uphold an aircraft registration tax that, along with other taxes, helped to finance air navigational facilities and services. See 435 U.S. at 446-47. In the portion of the opinion that fashioned the three-part test, the Court stated the second component to be a requirement that the charges "are based on a fair approximation of use of the system." Id. at 466 (emphasis added); see also id. at 469 ("It follows that a State may not complain of the application of [the registration tax statute] on the ground it is not a fair approximation of use."). However, when the Court applied the three-part test to the challenged aircraft registration tax, it said that the tax satisfied "the requirement that it be a fair approximation of the cost of the benefits civil aircraft receive from the federal activities." Id. at 467 (emphasis added); see id. at 468 ("[T]he present scheme nevertheless is a fair approximation of the cost of the benefits each aircraft receives."); see also id. at 463 n.19 ("A user-fee rationale may be invoked whenever the United States is recovering a fair approximation of the cost of benefits supplied.").[2]
 
 
 24
 In some circumstances, one would expect no difference whether the fair approximation inquiry focused on the use of benefits or their cost. For example, if each landing of an airplane required one airport employee to perform a particular service, an assessment of fees based on the number of landings would fairly approximate (indeed, precisely reflect) both use of the service and the cost of providing it. A difference would arise, however, if larger airplanes required a greater number of airport employees to render the needed service, but fees were still based on the number of landings. In that event, fees based on the number of landings would still precisely reflect use of the service, but only approximately reflect the cost, and the accuracy of the approximation would diminish for carriers who landed mostly airplanes small enough to require servicing by only one employee; the per-landing fee would oblige them to share part of the added cost of providing the service to planes requiring servicing by many employees.
 
 
 25
 The Supreme Court's application of the fair approximation test in Massachusetts to uphold the challenged aircraft registration tax appears to tilt the analysis toward consideration of use. The amount of the tax depended upon the type of aircraft engine (piston or turbine) and the maximum certificated takeoff weight. See id. at 446 n.1, 450. Of the other three taxes, one was imposed on each gallon of aircraft fuel, and two were imposed (at different rates) on each pound of aircraft tires and tubes. See id. at 468. Assessing the combined effect of the four taxes, the Court said:
 
 
 26
 The four taxes, taken together, fairly reflect the benefits received, since three are geared directly to use, whereas the fourth, the aircraft registration tax, is designed to give weight to factors affecting the level of use of the navigational facilities.
 
 
 27
 Id. at 468-69 (emphases added). The Court noted Congress's recognition of the fact that "'heavier and faster aircraft are generally responsible for much of the increased need of sophisticated control facilities and approach and landing facilities,'" id. at 451 n.9 (quoting H.R. Rep. No. 91-601, at 48 (1969)), thus demonstrating that calibrating the amount of the tax by the weight of the aircraft fairly approximated use of the navigational system.
 
 
 28
 The tilt toward use, rather than cost, is also evident in the Commerce Clause decision from which the Massachusetts test was borrowed. See Evansville-Vanderburgh Airport Authority District v. Delta Airlines, Inc., 405 U.S. 707, 716-20 (1972). In Evansville-Vanderburgh, the Supreme Court ruled that the Commerce Clause did not prohibit states or municipalities from charging commercial airlines $1 per commercial airline passenger at airports within their jurisdiction in order to defray costs related to airport facilities. The Supreme Court concluded:
 
 
 29
 At least so long as the toll is based on some fair approximation of use or privilege for use, as was that before us in Capitol Greyhound, and is neither discriminatory against interstate commerce nor excessive in comparison with the governmental benefit conferred, it will pass constitutional muster, even though some other formula might reflect more exactly the relative use of the state facilities by individual users.
 
 
 30
 Id. at 716-17 (emphasis added).[3] Applying this test, the Supreme Court concluded that the charges "reflect a fair, if imperfect, approximation of the use of facilities for whose benefit they are imposed," id. at 717 (emphasis added), even despite exemptions for certain classes of passengers and aircraft and for non-passenger users of airport facilities, because "distinctions based on aircraft weight or commercial versus private use do not render these charges wholly irrational as a measure of the relative use of the facilities for whose benefit they are levied," id.at 719 (emphasis added); cf. Northwest Airlines, Inc. v. County of Kent, 510 U.S. 355, 369 (1994) (airport's decision to "allocate costs according to a formula that" did not allocate portion of aircraft costs to airport concessionaires "appears to 'reflect a fair, if imperfect, approximation of the use of facilities for whose benefit they are imposed'" because airport concessionaires used only terminal facilities, not runways and navigational facilities) (quoting Evansville, 405 U.S. at 717).[4]
 
 
 31
 Ultimately, of course, the Massachusetts test is concerned with whether the challenged method for imposing charges fairly apportions the cost of providing a service, but by framing the second component of the test in terms of "use," the Court made clear that a method for imposing charges based on each payer's approximate use will pass muster as an adequate apportionment of costs. The alternative, nowhere evident in the Massachusetts opinion, is to engage in a detailed cost accounting analysis that endeavors to determine the cost, properly allocated to each payer, of every person, product, and facility involved in providing the service. The Court evidently was satisfied that a fair approximation of the use of the service adequately serves as a surrogate for an otherwise complicated and expensive attempt to allocate costs. See Brock v. Washington Metropolitan Area Transit Authority, 796 F.2d 481, 485 (D.C. Cir. 1986) (Ruth Bader Ginsburg, J.) ("Massachusettsdid not hold that a user fee must represent retrospectively a close approximation of the actual, historical benefit to the user. Rather, Massachusetts held only that the method used to calculate the fee must rationally be designed to approximate prospectively the benefit to the user.").
 
 
 32
 Services Used and Available for Use. The Massachusetts test applies not only to services used but also to services available for use. As the Court noted:
 
 
 33
 Every aircraft that flies in the navigable airspace of the United States has available to it the navigational assistance and other special services supplied by the United States. And even those aircraft, if there are any, that have never received specific services from the National Government benefit from them in the sense that the services are available for their use if needed ....
 
 
 34
 Massachusetts, 435 U.S. at 468 (footnotes omitted).
 
 II. Application of the Massachusetts Test
 
 35
 It is undisputed that NYDEC's waste regulatory charges are calculated on a basis that reflects the size of an entity's operations. Specifically, the hazardous waste program charges are calculated based on tons of hazardous waste generated annually, seeN.Y. Envtl. Conserv. Law § 72-0402(1), and on the tons of hazardous waste received annually by a treatment, storage, or disposal facility, seeid.§ 72-0402(2)(a),(b). Hazardous waste program charges also include additional charges for operating one or more landfills to receive hazardous waste, for each incinerator or unit that burns hazardous waste for energy recovery, and for providing for the treatment, storage, or disposal of hazardous waste in one or more surface impoundments. Seeid.§ 72-0402(2)(i)- (iv). Waste transporter program charges are calculated based on the number of vehicles permitted to be used to transport waste. Seeid.§ 72-0502.
 
 
 36
 To demonstrate the relationship between its method of calculating hazardous waste program charges and the services it makes available, NYDEC submitted the affidavit of John L. Middelkoop, chief of NYDEC's Bureau of Eastern Hazardous Waste Programs. Middelkoop categorized the purposes of the "regulatory services which [NY]DEC provides to generators" of hazardous wastes:
 
 
 37
 a) to assure that New York State has sufficient treatment, storage, and disposal capacity for the amount of hazardous waste which is generated in the State (hereinafter, "capacity assurance services"); b) to effect a reduction in the amount of hazardous waste which is generated in the State (hereinafter, "waste reduction services"); and c) to assure that generators properly store, report, label and ship their hazardous waste to a facility which is permitted to receive the waste (hereinafter, "storing, reporting, labeling, and shipping services").
 
 
 38
 For each kind of service, Middelkoop explained, the service provided increases in proportion to the amount of waste generated, primarily because each service requires NYDEC to inspect the operations of generators, either to ensure compliance with existing requirements or to determine the accuracy of information necessary to execute the services properly.[5] In turn, inspectors must obtain "so much more information" from generators "as they generate larger quantities of hazardous waste" because "there are more requirements in the regulations because the size of the plant, the complexity of the process, the risk to the environment and the amount of records which must be reviewed is, usually, proportional to the quantity of hazardous waste generated." In general, facilities receiving over 1,000 tons of hazardous waste annually "are larger, and their design, construction and operation is more complex. [NY]DEC's review of a permit application for a larger facility requires more involvement and time than its review of an application for a smaller facility."
 
 
 39
 Similarly, in providing services targeted to operators of hazardous waste facilities, "[t]he potential for significant noncompliance occurs more frequently at landfills, surface impoundments and facilities which receive large amounts of hazardous waste annually than at other facilities." The permit applications for facilities with landfills, surface impoundments, or incinerator units are more complicated and require a large amount of NYDEC involvement and time. For example, to design and site a surface impoundment that receives hazardous waste, one must, among other things, design a liner and groundwater monitoring system.
 
 
 40
 NYDEC also submitted the affidavit of Robert Haggerty, Director of NYDEC's Bureau of Technical Support of the Division of Hazardous Substances Regulation. Haggerty explained that under the waste transporter program, NYDEC acts to ensure that wastes "are properly identified and shipped to appropriate treatment or disposal facilities." NYDEC inspectors "routinely visit such facilities to assure that transporters are not violating their permits by, inter alia, depositing hazardous waste, regulated medical waste, or low level radioactive waste, at facilities which are not authorized to treat or dispose of such waste."
 
 
 41
 Based on this evidence, the District Court properly ruled that the waste regulatory charges meet the "fair approximation" component of the Massachusettstest. By assessing a higher charge based on the amount of hazardous waste generated or received, as well as imposing additional charges for each incinerator, landfill, and surface impoundment, the method of calculating the hazardous waste program charges is reasonably designed to fairly approximate use of the hazardous waste system's available services, and thereby to approximate the cost of supplying such services to particular generators of waste or operators of waste facilities. By charging for each vehicle permitted to be used to transport waste, the method of calculating waste transporter program charges is reasonably designed to fairly approximate use of NYDEC's services and thereby to roughly approximate the cost of supplying these services to transporters of waste.
 
 
 42
 USDOE disputes that NYDEC's waste regulatory charges fairly approximate the federal facilities' use of the State's available hazardous waste services by pointing out that half of the total waste regulatory charges assessed currently finance the New York state superfund, and that USDOE makes no use of the superfund, which finances decontamination only of sites for which no solvent owner or operator can be found to pay for the cleanup. The Supreme Court has made clear, however, that, as long as charges fairly approximate use and thereby fairly approximate costs of available services, it does not matter whether or how a governmental entity segregates the money it collects. In Evansville, the Court rejected the similar argument that charges were not based on use because half of the revenues generated were allocated to unrestricted general revenue. See Evansville, 405 U.S. at 720. "[S]o long as the funds received by local authorities under the statute are not shown to exceed their airport costs, it is immaterial whether those funds are expressly earmarked for airport use." Id. See Center for Auto Safety, Inc. v. Athey, 37 F.3d 139, 144 (4th Cir. 1994) (immaterial that Maryland does not keep charity registration fees in separate fund but turns them over to state treasury); New Hampshire Motor Transport Ass'n v. Flynn, 751 F.2d 43, 49 (1st Cir. 1984) (irrelevant that 75 percent of revenues from state license fee for vehicles carrying certain amount of hazardous waste will finance state hazardous waste cleanup fund, even if that fund has "relatively little to do with road transport"). New York does not violate the Massachusetts test by earmarking half of the hazardous waste fees for its superfund and using general revenues to pay for portions of the services available to hazardous waste producers.
 
 
 43
 III. Rebutting Reasonableness of Charges That Meet the Massachusetts Test
 
 
 44
 USDOE contends that even if NYDEC's method of imposing charges is designed to fairly approximate use of available hazardous waste services, the method is not reasonable as applied to USDOE's facilities because the charges imposed greatly exceed the actual cost of supplying services to these facilities. USDOE enlists Maine v. Department of Navy, 973 F.2d 1007 (1st Cir. 1992), in which the First Circuit ruled that fees imposed by Maine on a United States Navy shipyard had not been shown to be unreasonable under the pre-1992 RCRA waiver of sovereign immunity. See 973 F.2d at 1013-14. That ruling, USDOE points out, rested in part on data showing that fees paid, $54,500, were slightly less than the actual costs of regulatory activities related to the shipyard, $61,000. Here, by contrast, USDOE contends, the charges are nine times the costs of the services received.
 
 
 45
 Maine, however, did not establish a rule that a fee system, reasonably designed to fairly approximate use of available regulatory services, may be successfully challenged whenever the fees paid by one user can be shown to exceed the actual cost of services made available to that user. Maine simply ruled that the showing that the shipyard's fees were slightly less than actual costs was "sufficient," along with other data, to defeat the Navy's motion for summary judgment. See 973 F.2d at 1013. Moreover, even if we assume, for purposes of this appeal, that a fee system would be unreasonable as applied to a user of regulatory services if the user could show that its fees significantly exceeded the actual cost of services (both those used and those available for its use), USDOE has not made such a showing.
 
 
 46
 USDOE calculated a nine-to-one ratio of charges to services based on NYDEC's answer to the following interrogatory:
 
 
 47
 Please describe the services received from you by each facility in each year for each type of fee and assessment, e.g., site inspections, data evaluations, monitoring, reviewing, visits, technical assistance, consultation, processing, reports, studies, general administration. For each such activity, please state: the type of activity, the identity of each person who performed the activity; the date or dates when the activity was performed; and the cost to you of the activity.
 
 
 48
 In response, NYDEC answered that it could not provide a "complete answer to this interrogatory because some of the information requested is not regularly recorded and maintained by [NY]DEC" or "may be in files which are not indexed and/or which [NY]DEC does not know to exist." Noting that it answered the interrogatory "to the extent [NY]DEC and the Commissioner are able," NYDEC provided time and activity records, which consisted of sixty-three pages of "computerized raw data and estimates." USDOE then multiplied "the hourly rates established by the [time and activity] sheets" by the "hours spent by each NYDEC employee who performed services for one of the federal facilities." Reply Brief for Appellants at 8.
 
 
 49
 NYDEC responds initially that these calculations are inaccurate because the answer to the interrogatory asking NYDEC to describe the services received "was not intended to reflect the full scope of the services actually provided by [NY]DEC nor the overall benefits received by federal facilities." Brief for Appellee at 25 n.21. The more basic defect in the calculation is that it is incorrectly limited to services used, rather than including services or benefits available for use. SeeMassachusetts, 435 U.S. at 468 ("[E]ven those aircraft, if there are any, that have never received specific services from the National Government benefit from them in the sense that the services are available for their use if needed . . . ."); Maine, 973 F.2d at 1014 (permissible to include cost of state emergency response team in state regulatory charge, even though team never had responded to spill at Navy's facility).
 
 
 50
 In this case, USDOE calculated its nine-to-one ratio from data offered in response to an interrogatory asking for information for services "received" by the federal facilities, not for services made available to those facilities. The time and activity records upon which USDOE rely indicate only hours worked by NYDEC employees for a particular federal facility, and therefore cannot capture NYDEC's additional costs for making services available to that facility.
 
 
 51
 The method for assessing waste regulatory charges has not been shown to be unreasonable as applied.
 
 Conclusion
 
 52
 The judgment of the District Court is affirmed.
 
 
 
 Notes:
 
 
 [1]
 "[T]he issue before this Court is whether, using the analysis contained in Massachusetts, the regulatory assessments at issue are so high as to be beyond the scope of the reasonable service charges waivers contained in RCRA." Brief for Appellants at 18. The Appellants have not conceded that the Massachusetts test is applicable to all state charges assessed against the United States. See id.
 
 
 [2]
 In United States v. Sperry Corp., 493 U.S. 52 (1989), the Court quoted the phrase "fair approximation of the cost of benefits" from footnote 19 of Massachusetts and simultaneously emphasized that the Government need not "record invoices and billable hours to justify the cost of its services." Id. at 60.
 
 
 [3]
 In Capitol Greyhound Lines v. Brice, 339 U.S. 542 (1950), the Supreme Court upheld a Maryland tax that assessed two percent of the fair market value of the motor vehicle of any common carrier transporting passengers over Maryland roads. Rejecting the petitioners' argument that the tax's formula, regardless of the amount of revenue generated, violated the Commerce Clause, the Supreme Court explained that the tax "should be judged by its result, not its formula, and must stand unless proven to be unreasonable in amount for the privilege granted," id. at 545, and later stated that "taxes like that of Maryland here are valid unless the amount is shown to be in excess of fair compensation for the privilege of using state roads," id. at 547.
 
 
 [4]
 Cases applying the "fair approximation" test in the Commerce Clause context reflect some uncertainty whether the focus is on use or cost. Compare Alamo Rent-A-Car, Inc. v. City of Palm Springs, 955 F.2d 30, 31 (9th Cir. 1992) (per curiam) (calculating fee for use of airport access roads as seven percent of gross receipts that rental car company generates from customers picked up at airport fairly approximates the "indirect use of the entire airport facility that [the company] makes through the travelers it services")(footnote omitted) (emphasis added); Alamo Rent-A-Car, Inc. v. Sarasota-Manatee Airport Authority, 906 F.2d 516, 520 (11th Cir. 1990) (calculating airport's user fee on off-airport car rental company as ten percent of gross receipts from customers who came from airport fairly approximates use, because airport "could reasonably conclude that the ten percent fee on average represents Alamo's use of the airport facility") (emphasis added) (footnote omitted) with Center For Auto Safety, Inc. v. Athey, 37 F.3d 139, 143 (4th Cir. 1994) (Maryland "fee structure" imposing charity registration fee based on total contributions received by that charity in previous year "represents a fair, if imperfect, approximation of the cost of using Maryland facilities and services for the charity's benefit" because "the record clearly shows that the . . . costs of monitoring charities increase with larger charities") (emphases added).
 
 
 [5]
 In his deposition, when asked about additional services provided by NYDEC to waste generators but not mentioned in his affidavit, Middelkoop referred to "technical assistance . . . [W]e do have phone numbers and we do have staff provided to assist in making hazardous waste determination, assist in determining what the regulations mean. We have hot lines for waste reduction activities." When asked why he did not mention these services in his affidavit, Middelkoop explained, "Because I have no knowledge as to whether or not federal facilities have ever availed themselves of those services. They are also minor services."